In re Gary **MANTOLESKY**, d/b/a International House of Pancakes, Debtor.

**Bankruptcy No. 4-80-00100-G.**

United States Bankruptcy Court, D. Massachusetts.

Nov. 5, 1981.

Philip J. Hendel, Springfield, Mass., for plaintiff.

Jeffrey Zivyak, New York City, for defendant.

MEMORANDUM AND ORDER ON MOTION TO COMPEL ANSWERS, APPLICATION FOR PROTECTIVE ORDER, AND APPLICATION FOR SHOW CAUSE ORDER ON CONTEMPT

PAUL W. GLENNON, Bankruptcy Judge.

On February 2, 1980 Gary Mantolesky filed a voluntary Chapter 11 petition for reorganization under the new Bankruptcy Code. 11 U.S.C. §§ 1101, et seq., as amended by P.L. 95–598 (1978). The debtor is an individual who, at the time of the filing of his petition, operated two restaurants under franchise agreements with International House of Pancakes, Inc. ("IHOP"). The debtor is currently operating at least one of those restaurants, but has as yet filed no plan of reorganization. His failure to do so, it is argued, is as a result of the dispute that is before me today. Gary Mantolesky was at one time an employee of IHOP. Through some set of circumstances which as yet remain unproved, he came to be involved in a business arrangement with one Alfred Greco, an attorney who now works and resides in the New York City area. The debtor alleges that at some time in 1978 he was approached by one of his superiors at IHOP, a Robert Elias, about purchasing a ⅓ share of an IHOP franchise, store # 47–26, in Springfield, Massachusetts. It is further alleged that his franchise was owned at that time by Greco, Elias' alleged brother-in-law, and one Harold Matthews. Mantolesky was purportedly offered Matthews' ⅓ share in the partnership with Greco, and Mantolesky did in fact acquire that interest. The partnership agreement was to place Mantolesky in operation of the restaurant, while Greco would handle all administrative functions, including the payment of bills and taxes. Arrangement was allegedly repeated in a subsequent deal in 1979, for an IHOP franchise in Westfield, Massachusetts, store # 47–34. It is further alleged by the debtor that the funds of both partnership ventures were kept in two banks in five separate accounts, four of which required only the signature of Greco. It is the complete control by Greco of partnership funds which the debtor seeks to investigate.

It is alleged by the debtor that Greco failed to pay certain obligations of the two restaurants and also failed to file or prepare final partnership tax returns. As a result, the debtor argues that he has been unable to render a final accounting of all the assets

of the partnership. Under those circumstances, the debtor sought and obtained permission from this court to examine Mr. Greco pursuant to Bankruptcy Rule 205, which reads:

> Upon application of any party in interest, the Court may order the examination of *any* person. (Emphasis added).

Pursuant to Rule 205(e) and Rule 916 of the Bankruptcy Rules, a subpoena was issued for the appearance of Alfred Greco in Springfield, Massachusetts for a deposition. While Mr. Greco initially challenged the propriety of the subpoena, it was eventually agreed that his deposition would be taken at his office in New York. In addition, Mr. Greco was commanded to bring with him "all books and records, cancelled checks, bank statements, tax returns for calendar years 1978 and 1979 and work sheets used in their preparation and all other financial information related to financial transactions of the partnership arrangement of Gary S. Mantolesky d/b/a International House of Pancakes and Alfred V. Greco and partnership operations in Springfield, Massachusetts between February 6, 1978 and December 10, 1979 and in Westfield, Massachusetts between March 4, 1979 and December 10, 1979." While Mr. Greco has at all times maintained that he is beyond the subpoena power of this court,[1] he agreed to be deponed in New York on February 11, 1981. During the course of the questioning, Greco refused to answer certain questions regarding a number of issues.

On March 20, 1981 the debtor filed an "Application to Compel Answers to Question Posed to Alfred V. Greco in an Examination Pursuant to Rule 205." In the alternative, Mr. Greco filed on April 8, 1981 an "Application for Protective Order." Since the two applications address the same issues, I shall discuss them in the same light.

There was a hearing on the two applications at which counsel were allowed to argue their requests orally, and the matter was taken under advisement. Since that time, the debtor has been endeavoring to obtain all of the financial records which he

sought by way of his original subpoena. In that regard, the debtor has alleged that Greco is in possession of all relevant receipts, documents, bills, statements and cancelled checks which arose during the time of Mantolesky's and Greco's business affiliation. In addition, the debtor argues that while much of the information has been provided, Mr. Greco has failed to produce "actual bills from trade creditors upon which payments to them were predicated", as well as "itemized back-up statements for the telephone bills itemizing the long distance calls". The debtor says it needs this information because his investigation indicates that some of the checks that were written by Mr. Greco were not to creditors of either of the IHOP restaurants which Mantolesky operated. Finally, the debtor argues that Mr. Greco has failed to produce all of the cancelled check stubs and bank statements, as well as the original working papers needed for completion of partnership tax returns of 1979. This fact, it is argued, is delaying the filing of a Chapter 11 plan of reorganization.

As a result of this state of affairs, the debtor filed on September 22, 1981 its "Application for Order to Show Cause Why Contempt Citation Should Not Issue," the basic allegation of which is that Greco has failed to comply with the subpoena of the court. The matter was set down for hearing on October 20, 1981, at which time counsel for Mr. Greco waived oral argument and submitted instead an "Affidavit of Alfred V. Greco In Opposition to Application for Order to Show Cause." This "affidavit" is better described as a memorandum on the facts and law involved, as it presents argument on both the factual and legal issues involved.

Essentially, Mr. Greco's argument is that the debtor states no legal grounds as support for his application, that in fact he has produced all that he is capable of producing, and that the Bankruptcy Court, in any event, does not have the power to punish as a contempt a failure to obey a subpoena.

---

1. That question has not as yet been ruled upon by this court.

## I. SCOPE OF DISCOVERY UNDER BANKRUPTCY RULE 205

■ Subsection (d) of Rule 205 sets forth the limits of such an examination.

(d) Scope of Examination. The examination under subdivisions (a) and (b) of this rule may relate only to the acts, conduct, or property of the bankruptcy, or to any matter which may affect the administration of the bankrupt's estate, or to his right to discharge.

Bankruptcy Rule 205(d).

Perhaps an eminent and oft-cited commentator put it best, by saying

An examination under the broad scope of Rule 205(d) is in the nature of an inquisition and consequently the field of inquiry is wide; within the limitations prescribed any question is permissable which seeks to ascertain facts concerning the bankrupt's (debtor's) conduct, property and affairs.

\*　　\*　　\*　　\*　　\*　　\*

The inquiry undertaken, therefore, is one to aid in the discovery of assets and to assist in all particulars in the administration of the estate, and the fact that no specified issue is or can be made up is not grounds for objecting to the examination.

12 *Collier on Bankruptcy* ¶ 205.15 at p. 2–93 (14th Ed. 1978).

Under this analysis all sorts of matters may be the subject of inquiry so long as they may become important in the administration of the estate. *Collier* cites the decision of *In re Foerst*, 93 F. 190 (S.D.N.Y.1899), for a general statement about the nature of a Rule 205 examination.

There is no precise rule governing the admissibility of such testimony, other than it should be reasonably pertinent to the subject of inquiry. In general, a large latitude of inquiry should be allowed in the examination of persons closely connected with the bankrupt in business dealings, or otherwise, for the purpose of discovering assets and unearthing frauds, upon any reasonable surmise that they have assets of the debtor. \* \* \* The examination for this purpose is

of necessity to a considerable extent, a fishing examination. \* \* \* Where questionable proceedings have been disclosed, greater latitude in the prosecution of inquiries should be allowed . . . .

*In re Foerst*, supra at 191.

Having discussed the general nature of a Rule 205 examination, the broad scope of its permissible inquiry, and the possible limits upon that inquiry, *Collier* goes on to note:

Thus, where the witness is known to have been closely connected with the bankrupt [debtor] in business dealings, great latitude will be allowed. The examination, of course, must be confined within the limits of the general inquiry permitted, and if the questions are not relevant to such matters, the witness is justified in refusing to answer them. The examination cannot be used to delve into the private affairs of a witness, where such affairs have no connection with the matters set out in Rule 205(d) but if a relationship can be shown with the bankrupt's [debtor's] affairs, the witness will be required to answer.

12 *Collier on Bankruptcy* ¶ 205.15[1] at p. 2–94 (14th Ed. 1978); see also, *In re Dependable Merchandise Corp.*, 14 F.R.D. 257 (S.D.N.Y.1953).

The clarity and sophistication of *Colliers'* analysis of the Rule 205 dilemma cannot be overlooked. Nor can the applicability of the aforementioned paragraph to the matter at hand be given short shrift. Rule 205 provides all interested parties a mechanism for the investigation and reconstruction of the debtor's affairs. That mechanism may cut a broad swath through the debtor's affairs, those associated with him, and those who might have had business dealings with him. Further, those persons who might have been closely connected with the debtor in his business arrangements, or who even participated in them, will most likely be exposed to the most extensive inquiry. For where a third person's business affairs are intertwined with those of the debtor, the exact point where the business association ends can be difficult to ascertain. However, Rule 205 is not a device to be used to

delve into all matter of the private non-related affairs of a third party. The primary concern for this debtor, at this time, is to obtain all of his past financial records and information. At this time, that is Mr. Greco's only relationship with this debtor, the fact that he handled the business affairs of the two IHOP restaurants. Moreover, while a Rule 205 Examination can be an "inquisition" for the debtor, the inquiry to be made of third persons should be limited to the facts of their association with the debtor. Here we are concerned at present only with obtaining as much financial information about this debtor from Mr. Greco as he is capable of providing, and not with his overall personal business affairs. It may come to light from this examination that cause exists to delve further into Mr. Greco's personal affairs, but no such cause appears as yet. The debtor might wish this court to believe that there is sufficient cause for a broader examination, but as yet the debtor has provided no concrete evidence to warrant more extensive inquiry. Finally, the Rule 205 examination is largely a neutral form of procedure. It often gives rise to more formal proceedings, including complaints to avoid fraudulent transfers and to recover other assets. It is not of itself a dispute mechanism, nor should the inquiry be adversarial. At this juncture of the Chapter 11 proceeding, the court is only concerned with creating an accurate picture of Mr. Mantolesky's pre-petition financial affairs, and Mr. Greco's testimony may be essential to this task. But that should not expose him to all matter of questioning about his own personal affairs, at least not until it can be shown that there is a reasonable likelihood that such inquiry is necessary complete the debtor's "financial picture".

■ I note here that the debtor in its application makes no reference to specific questions which Mr. Greco refused to answer. Normally the court cannot rule on a motion to compel answers unless it knows the substance of the specific inquiry made. However, Mr. Greco, in his application for protective order, specified a number of questions which he found objectionable, although it is nowhere indicated whether these were in fact all or any part of the questions he refused to answer. Assuming however that the questions specified are the only ones for decision here, the court makes the following rulings.

■ 1. The following questions are found to be outside the scope of a Rule 205 examination at this time:

a. Were there any other ventures in which you were a partner of any other individual subsequent to your practicing law, Mr. Greco; ... in connection with any business venture, not necessarily that franchise?

b. Was Mr. Ellias instrumental in your getting with Mr. Matthews initially with respect to the Springfield franchise 47–26?

c. Did you make inquiry as to what reaction International House of Pancakes would have upon the termination if one of its employees became a partner of yourself in 47–26?

d. Did you make inquiry to International House of Pancakes concerning what effects there would be upon Gary becoming a partner after terminating his employment with International House of Pancakes?

e. Was International House of Pancakes aware of your partnership with Mr. Matthews in 47–26?

f. Were you aware that International House of Pancakes was not aware of your involvement in 47–26?

g. Based upon your experience with IHOP franchises, would you hazard a guess as to what that may be?

h. Did you at any time, Al ever tell Gary not to inform IHOP, the franchisor about your partnership with Gary?

i. Are you aware of any provision that would compel an individual who entered into a partnership with another individual to reveal that partnership to IHOP—with respect to any partnership agreement concerning the operation of a particular unit?

j. Were you then engaged in any other partnership with any other individual for the operation of IHOP stores?

k. Wasn't it true Mr. Greco that you were engaged at the same time in business with other individuals for other IHOP stores?

l. Where you not a partner in other ventures, Mr. Greco, similar to the Gary Mantolesky situation?

m. How did you become a partner with Mr. Matthews?

n. Was IHOP aware of your relationship, your partnership with Mr. Matthews?

o. Did you ever pay any monies to Mr. Matthews when you entered into your original partnership with Mr. Matthews for the purchase of the 47–26 franchise?

p. Did Mr. Matthews ever pay any money to you upon your initially entering into your partnership agreement with Mr. Matthews in the 47–26 operation?

q. Did you ever make a capital investment in the purchase of 47–26 at any time?

r. Was Mr. Madia[?] also performing other services for you with respect to other IHOP franchises?

s. Do you know when Mr. Ellias terminated his relationship with IHOP?

t. Did that circumstance have any bearing on your wanting to sell your interests in the store or divest yourself of the store 47–26 or 47–34?

u. Did it operate the West Hempstead International House of Pancakes store?

v. Did AVG Operating Company, Inc. operate any other stores other than 47–26?

All of these questions show no apparent relationship to the collection of data about the debtor's business or in any way indicate that they might be reasonably calculated to lead to the discovery of financial information about the debtor. When and if it were to become apparent that the other business affairs of Alfred Greco were germane to the Mantolesky Chapter 11 proceeding, some of these questions could possibly be allowed. Until further order of the court, however, Mr. Greco shall be privileged not to answer the aforementioned questions.

■ 2. The following questions are found to be within the scope of this Rule 205 examination.

a. Were all monies that were due International House of Pancakes totally current and up to date at the time you entered into this agreement with Mr. Mantolesky?

b. Did you ever have any conversation with Mr. Mantolesky concerning the amounts due to IHOP, Inc. on account of advertising?

c. And who were the other stockholders of AVG Operating Company?

d. Did AVG Operating Company have any assets at this time?

e. What is your position? What is your capacity in AVG Operating Company, Inc.? Were you the president of AVG Operating Company, Inc.? Were there other officers and directors of that corporation besides yourself?

These questions either seek direct information about financial matters of concern to the debtor, or seek information about a corporate partner of the debtor, which apparently performed the same functions Mr. Greco did after succeeding to Mr. Greco's interest, and performed those functions up to the date of the filing of the Chapter 11 petition. Therefore, Mr. Greco shall be ordered to answer these questions in connection with his examination.

■ As a final note, let me emphasize that the decision today is based solely on the court's determination of what is and is not discoverable in a 205 Examination under the circumstances presented. The argument by Mr. Greco that the debtor's questions indicate collusion between the debtor and a plaintiff suing Greco in another court is disregarded as factually insufficient and legally incorrect. Just as the court does not act on the impression created by the debtor's questions that Mr. Greco may have acted improperly, the court cannot make fact findings concerning other possible impressions which might be created by those

questions. Thus, my decision today in no way reflects a determination that the debtor is using the 205 examination for any improper purpose. Furthermore, the law is clear that pending litigation by others against the person sought to be examined, and the possible use of 205 testimony in that collateral litigation, is not sufficient reason for denying examination. See *In re Manufacturers Trading Corp.*, 194 F.2d 948, 958 (6th Cir. 1952); *Marx v. Chase National Bank*, 117 F.2d 800 (2d Cir. 1941).

## II. APPLICATION FOR ORDER TO SHOW CAUSE WHY CONTEMPT CITATION SHOULD NOT ISSUE

In this case, the debtor has argued that Mr. Greco has failed to comply with a subpoena duces tecum in that he has not come forth with all of the books and financial records requested of him, thereby justifying the issuance of a contempt citation. Mr. Greco argues that not only is the debtor's application factually insufficient in that there has been no failure to comply with a *valid* subpoena, but that even if there were such a failure to comply, the court does not have the power to punish that failure with a contempt order.

■ Initially, I must reject in toto the argument of Mr. Greco that the language of Rule 45(f) of the Federal Rules of Civil Procedure has no effect in bankruptcy proceedings. To the contrary, Rule 45 of the Federal Rules of Civil Procedure is expressly made applicable to all bankruptcy proceedings, and particularly to Rule 205 examinations. See Bankruptcy Rules 916 and 205(e). Bankruptcy Rule 920 specifies the limits of the court's contempt power, and also designates the procedure for punishment beyond the limits of the bankruptcy court's contempt power. Indeed, the cases cited by the debtor clearly indicate that a bankruptcy judge has the power to hold the person to be examined under Rule 205 in contempt of court for failure to answer a subpoena or for refusal to make production of requested documents. See *Docteroff v. New York Credit Men's Adjustment Bureau*, 187 F.2d 4 (2nd Cir. 1951); also, *Matter of Hailey*, 6 B.C.D. 878, 621 F.2d 169 (5th Cir. 1980); *Matter of Bazan*, 6 B.C.D. 1345, 6 B.R. 937 (Bkrtcy.N.D.Ill.1980). This court can and will punish by contempt citation those violations of its orders which Rule 45 permits.

■ Turning now to the facts at hand, there is no question that Alfred Greco resides outside the District of Massachusetts and more than 100 miles from the designated city of deposition, and therefore cannot be compelled to attend a deposition in that city. *In re MMI Associates, Ltd.*, 423 F.Supp. 41 (W.D.N.C.1976). Moreover, I cannot accept the debtor's argument that by agreeing to appear and testify in New York City Greco waived his right to object to the subpoena in question. Greco voluntarily agreed to appear, not in accordance with the subpoena, but at a place totally different than called for by the subpoena. The proper method for the debtor to follow, if he wishes to subject Mr. Greco to the power of a bankruptcy court, is to seek and obtain a subpoena from the Bankruptcy Court for the Southern District of New York, or from some other appropriate district, and serve the same upon Mr. Greco. However, Rule 45 states that under those circumstances Mr. Greco could only be examined in New York and would have to make all documents available there. In view of this conclusion, I see no reason to make any finding regarding Mr. Greco's compliance or non-compliance with this court's subpoena, since in either event he was under no obligation to do so.