**In re APEX OIL COMPANY, et al., Debtors.**

**Bankruptcy No. 87–03804–BSS. Motion No. 04–229C.**

United States Bankruptcy Court, E.D. Missouri, E.D.

May 31, 1989.

Bernard Shapiro, Robert Jay Moore, Howard J. Weg, Gendel, Raskoff, Shapiro & Quittner, Clayton, Mo., Bernard Shapiro, Robert Jay Moore, Howard J. Weg, Gendel, Raskoff, Shapiro & Quittner, Los Angeles, Cal., and Dennis A. Ferrazzano, Barack, Ferrazzano and Kirschbaum, Chicago, Ill., for debtors.

Lloyd A. Palans, Gallop, Johnson and Neuman, St. Louis, Mo., examiner.

Steven N. Cousins, Armstrong, Teasdale, Kramer, Vaughan & Schlafly, St. Louis, Mo., for unsecured creditors committee.

Robert H. Brownlee, St. Louis, Mo. and Roger A. Ferree, Los Angeles, Cal., for Chemical Bank.

Allen S. Boston, St. Louis, Mo. Attorney for Mr. Novelly.

Audrey Fleissig and John D. Evans, Jr., St. Louis, Mo., for Mr. Goldstein.

Kenneth J. Mallin, St. Louis, Mo., for Sun Affiliates.

Carl J. Lumley, St. Louis, Mo., for Henry Reid.

Jim J. Shoemake and Kirk R. Crowder, St. Louis, Mo., for Post–Dispatch and Pulitzer Publishing Co.

## MEMORANDUM OPINION

BARRY S. SCHERMER, Bankruptcy Judge.

### INTRODUCTION

On December 24, 1987, Apex Oil Company, a Missouri general partnership, and 51 subsidiary entities (hereinafter collectively "Apex" or the "Debtors") filed voluntary petitions under Chapter 11 of Title 11 of the United States Code.[1] The cases have been procedurally consolidated and Apex has continued in possession and operation of its various businesses.

On February 18, 1989, this Court approved a stipulation whereby the Debtors, the Debtor's principals, non-debtor affiliates and the Official Consolidated Unsecured Creditors' Committee established a procedure facilitating the production of documents requested by motion of the Examiner pursuant to Federal Rule of Bankruptcy Procedure 2004 (hereinafter the "Agreed Order No. 1"). On April 10, 1989, the St. Louis Post–Dispatch, the Pulitzer Publishing Company, and David Lipman, Managing Editor of the Post–Dispatch (hereinafter collectively referred to as the "Post–Dispatch") filed a Motion to vacate or modify Agreed Order No. 1. The Debtors, the Debtors' principals, certain non-debtor affiliates, the Official Consolidated Unsecured Creditors' Committee (hereinafter the "Committee") and other creditors, objected to the Post–Dispatch's Motion.

### JURISDICTION

This Court has jurisdiction over these cases, motions and the subject matter of this proceeding pursuant to 28 U.S.C. §§ 151, 157, 1334 and Local Rule 29 of the United States District Court for the Eastern District of Missouri. This is a "core proceeding" which the Court may hear and determine pursuant to 28 U.S.C. § 157(b)(2)(A) and (b)(2)(L).

### FACTS

At the time of filing Apex owned a vertically integrated business engaged in, *inter alia*, the refining, marketing and trading of petroleum products. In addition to the 54 debtors, there are approximately 37 non-debtor affiliate corporations, many of which are incorporated outside of the United States.

On January 27, 1988, pursuant to 11 U.S.C. §§ 1104 and 1106, this Court appointed an Examiner who was charged with examining matters designated by the Court upon request of parties in interest. The Examiner was further directed to take any necessary and appropriate action to assist the Court and the parties in bringing these bankruptcy proceedings to a just, prompt and economic disposition. As a "facilitator", the Examiner was specifically prohibited from advocating or aligning himself with a position on any given matter. Rather, the Examiner's role is limited to that of investigator and mediator.

On August 31, 1988, Apex filed two motions. The first motion was for an order of this Court authorizing the substantive consolidation of certain of the Debtors' estates (hereinafter the "Substantive Consolidation Motion"). The second motion was for an order of this Court authorizing Apex and the Committee to settle any claims against Apex's principals, Mr. P.A. Novelly and Mr. Sam Goldstein (hereinafter the "Release Motion"). Messrs. Novelly and Goldstein had offered to pay $5,000,000.00 to the Apex estates in exchange for releases by Apex and the Committee of any claims against them.

On September 1, 1988, this Court identified the Substantive Consolidation Motion and the Release Motion as "designated

---

**1.** On October 11, 1988, two additional entities, Goldstein Oil Company (hereinafter "GOC") and Novelly Oil Company (hereinafter "NOC") filed voluntary Chapter 11 petitions, bringing the number of Apex estates to 54. GOC and NOC are Missouri corporations and are the partners of the Apex Oil Company partnership.

matters". On January 11, 1989, the Court charged the Examiner with the preparation of a report (hereinafter the "Examiner's Report") in connection with these two Motions. Subsequently, Messrs. Novelly and Goldstein withdrew their offer to pay the Apex estates in exchange for their releases.[2] Furthermore, the Court has not set the Substantive Consolidation Motion for hearing because the Debtors' plan of reorganization, filed on March 28, 1989, provides for the consolidation of all but four of the Debtors' estates. Since the plan calls for substantive consolidation, the Court need not address the Substantive Consolidation Motion prior to plan approval.

Despite their mootness, neither motion has been formally withdrawn. Nevertheless, this Court has Ordered that any disclosure statement filed by the Debtors would not meet the requirements of § 1125 of the Bankruptcy Code, 11 U.S.C. § 101 et seq., (hereinafter the "Code") unless it included the Examiner's Report or an approved summary of it. Thus the purpose of the Examiner's Report was modified from that of examining the Substantive Consolidation and Release Motions to that of examining the financial transactions between the Debtors, their principals and non-debtor affiliates in order to qualify the Debtors' disclosure statement for approval.

In furtherance of his charge, the Examiner required the records of, and interviews with, the officers, accountants and various personnel associated with the Debtors, and the non-debtor affiliates and Messrs. Novelly and Goldstein (hereinafter the non-debtor affiliates and Messrs. Novelly and Goldstein shall be collectively referred to as the "Third Parties"). The Examiner estimated he would need to review in excess of 520,000 transfers, together with supporting documents, in order to consider: 1) all direct and indirect transfers by the 54 Debtors to or for the benefit of the principals of the Debtors over a pre-petition period of not less than 2 years, and 2) all direct and indirect benefits received or obtained

from the 54 Debtors by the principals of the Debtors over a pre-petition period of not less than 2 years. Consequently, on January 20, 1989, the Examiner filed various motions for authorization to conduct an examination of the Debtors, Third Parties and their accountants, pursuant to Federal Rule of Bankruptcy Procedure 2004.[3]

The Examiner's motions met with vehement objections by the Debtors and Third Parties on the grounds that the range of requested documents and depositions was extraordinarily broad, and compliance would unduly burden the Apex estates and Third Parties. Furthermore, 17 of the non-debtor affiliates objected to the Examiner's motions on the grounds that as foreign (off shore) corporations they were outside the Court's jurisdiction. In other words, they challenged this Court's ability to compel production of documents and attendance at depositions pursuant to F.R.B.P. 2004.

In addition to filing numerous motions to quash the Examiner's subpoenas and deny his motions, Messrs. Novelly and Goldstein and A.I.C. Ltd., a non-debtor affiliate, filed a Motion To Disqualify The Examiner based on an allegation of a recently discovered conflict of interest. To facilitate resolution of these disputes, the Examiner, his law firm, Messrs. Novelly and Goldstein, the Committee, the Debtors and certain non-debtor affiliates entered into a Stipulation And Agreed Order Establishing Procedures For The Production Of Documents Relevant To The Motion To Disqualify The Examiner (hereinafter the "Agreed Order No. 2"). The Motion To Disqualify the Examiner was subsequently withdrawn.

After numerous pleadings were submitted, the parties stipulated to an order establishing procedures for the production of documents and the taking of oral examinations pursuant to the Examiner's F.R. B.P. 2004 investigation. The stipulation was signed by Apex, the Committee, the attorneys for Messrs. Novelly and Goldstein, and the 17 objecting non-debtor affil-

---

**2.** At the request of the Committee, the Release Motion was continued indefinitely.

**3.** Hereinafter the Federal Rules of Bankruptcy Procedure shall be referred to as "F.R.B.P." and the Federal Rules of Civil Procedure shall be referred to as "F.R.C.P.".

iates. At a hearing on the matter, however, this Court refused to approve the stipulation because, *inter alia*, it placed the entire Examiner's Report under seal. The Debtors and Third Parties wanted exclusive access to the Examiner's Report to the exclusion of the Committee or the public. This Court refused to seal the Examiner's Report.

Consequently, a new stipulation was reached, the Agreed Order No. 1, wherein a procedure was developed for the free exchange of documents by the Debtors and Third Parties, and the examination of numerous individuals, pursuant to the Examiner's F.R.B.P. 2004 investigation. The Agreed Order No. 1 provides for: a) the production of thousands of documents by the subpoenaed entities, b) an acknowledgment that all such documents are "confidential", c) a limitation of the availability of these documents exclusively to the Examiner, and d) an allowance of five business days immediately following the Examiner's filing of his Report in which the Debtors and Third Parties could review the Report exclusively.[4] During this five day period the Debtors and Third Parties may object to the *disclosure* of all or part of the Examiner's Report and its exhibits. Such objections would then be submitted to the Court for an in camera inspection and ruling.

The Agreed Order was signed by the Court at a hearing on February 18, 1989. The Post–Dispatch was not represented by counsel, however, a reporter attended the hearing. On March 10, 1989, Mr. Lipman signed and delivered a letter requesting the Court reconsider its approval of the Agreed Order. Approximately three weeks later

the Post–Dispatch, by its counsel, inquired whether a response would be forthcoming. The Court advised Post–Dispatch counsel that it declined to respond to Mr. Lipman's ex parte request for relief.

On April 10, 1989, the Post–Dispatch filed a Motion To Intervene And to Request The Court To Vacate, Or In The Alternative, To Reconsider And Clarify The Agreed Order Regarding Procedure For The Production Of Documents And The Taking Of Depositions Or Oral Examination (hereinafter the "Post–Dispatch Motion"). Specifically, the Post–Dispatch requested access to the underlying documents supporting the Examiner's Report, to an unabridged copy of the Examiner's Report and its exhibits, and participation in any in camera review of documents the Debtors and Third Parties request sealed.[5] The Debtors, the Committee, Messrs. Novelly and Goldstein, the non-debtor affiliates and Chemical Bank have objected to the Post–Dispatch's Motion.

## DISCUSSION

### *Introduction*

The St. Louis Post–Dispatch is a newspaper operated by the Pulitzer Publishing Company. It serves the metropolitan St. Louis area with an average daily circulation in excess of 375,000 papers and an average Sunday circulation of 550,000 papers. The Post–Dispatch filed its Motion on behalf of the public.

■ It is undisputed that the Post–Dispatch has standing to intervene and challenge the validity of Agreed Order No. 1.

---

**4.** Originally the Examiner was scheduled to file his Report on June 1, 1989. On May 18, 1989, however, the Examiner requested, and was granted, leave to file his Report on June 12, 1989.

**5.** The Debtors had entered into a third stipulation with several of its creditors, (Chemical Bank [hereinafter "Chemical"], Sun Transport, Inc., Marine Investment Company of Delaware, Alaska Bulk Carriers, Inc., Kee Leasing Co., 652 Leasing Co., and 653 Leasing Co. [hereinafter collectively referred to as "Sun"]) who had objected to the Debtors' Substantive Consolidation Motion. Both Chemical and Sun requested dis-

covery of certain documents in connection with their objection. The Debtors, Chemical and Sun entered into an agreement establishing procedures for the review of these documents (hereinafter "Agreed Order No. 3").

The Post–Dispatch Motion refers to Agreed Orders Nos. 2 and 3, but fails to request any relief with respect to these orders. Since the Substantive Consolidated Motion and Release Motion are moot and no relief is sought with respect to Agreed Orders Nos. 2 and 3, this Court will only address the relief requested with respect to the Agreed Order No. 1.

**96**

The press has standing to intervene in actions to which it is otherwise not a party in order to petition for access to court proceedings and records. *Petition of Tribune Co.,* 784 F.2d 1518, 1521 (11th Cir.1986) (*citing, Newman v. Graddick,* 696 F.2d 796, 800 (11th Cir.1983)). While it is disputed whether or not the documents requested by the Post–Dispatch for review constitute judicial "records", this Court will nevertheless allow the Post–Dispatch to intervene so that the merits of their Motion may be addressed.

The Post–Dispatch seeks the following:

1. Immediate access to the unedited Examiner's Report including attached exhibits,

2. The right to object to and be heard on any attempt(s) to seal portions of the Examiner's Report, and

3. Access to the documents, testimony or sources of information upon which the Examiner relied, or which otherwise support the Examiner's findings (hereinafter all such documents and depositions shall be collectively referred to as "Underlying Documents").

See *Reply Brief in Support of Movant's Motion To Vacate, Or In The Alternative, Reconsider And Clarify The Agreed Order,* page 4. The Court denies requests numbered one and three and grants request number two. The Court shall address the first two requests in section A, and the Post–Dispatch's third request in section B.

### A) *Immediate Access To The Examiner's Report And Participation In The In Camera Review*

■ This Court denies the Post–Dispatch's request for access to the unabridged, unedited Examiner's Report. Rather, the Court chooses to abide by the provisions of Agreed Order No. 1 (as modified by the attached Order) and permit the Debtors and Third Parties exclusive access for three days to review the Examiner's Report while considering whether to request editing any confidential material.

Section 107(b) of the Code provides:

On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own Motion, the bankruptcy court may—

(1) protect an entity with respect to a trade secret or confidential research, development or commercial information; or

(2) protect a person with respect to scandalous or defamatory matter contained in a paper filed under this title.

This section of the Code protects parties in a bankruptcy proceeding from unnecessary public intrusion into their private affairs. Since only the Debtors and Third Parties are affected by the publication of any documents or information, they shall have an exclusive opportunity to review the Examiner's Report *first,* before it is made public. Only their rights are at stake, and § 107(b) provides an appropriate means for protecting those rights.

The Post–Dispatch argues that the portion of Agreed Order No. 1 permitting parties to "file in camera applications for protection from disclosure of portions of the report" violates § 107(b) by exceeding its permissible scope. See *Post–Dispatch Motion* p. 26. This Court disagrees. The Court cannot conceive of a means by which the Debtors or Third Parties can request protection pursuant to § 107(b) without submitting an application. Only after the Debtors and Third Parties have first reviewed the filed Examiner's Report can they discern which portions, if any, they would ask this Court to seal. No purpose would be served by sealing portions of the Report if prior to the sealing those portions are published. The Post–Dispatch shall not be permitted to peer over the Court's shoulder as it considers what, if any, material to protect. To allow that would defeat the entire purpose of an in camera facility.

The Court recognizes, however, that when it entertains a motion to deny public access under § 107(b), the public—as represented by the Post–Dispatch—should be allowed to intervene and be heard. *In re EPIC Assocs. V,* 54 B.R. 445, 13 BCD 820, 821 (Bkrtcy.E.D.Va.1985). Clearly the decision to seal documents should not be

made without the benefit of counter-arguments less the public be denied the opportunity to protect its broad right of access granted by § 107(a) and the common law.[6] *EPIC* 54 B.R. 445, 13 BCD at 821. The right to object to the sealing of records, however, does not include a right to review those records in their unedited state.

Nonetheless, this Court shall not alter the rights of the Post–Dispatch to object to attempts by the Debtors or Third Parties to seal any part of the Examiner's Report. The Post–Dispatch shall participate in all in camera proceedings as fully as the Committee, other creditors and parties in interest.[7] It shall not be treated any differently than the Committee, and the procedures for such participation have been outlined in the accompanying Order.

### B) *Access To The Underlying Documents*

■ The Post–Dispatch bases its Motion on its obligation to report on important matters affecting the public. The Apex bankruptcy proceedings are of interest to Apex's 8,000 creditors and the St. Louis community. As a conduit of information to the public, the Post–Dispatch believes it has both the right and responsibility to report on all matters of interest, including the contents of the Underlying Documents.

Public access to judicial records is an important component of government operations. It provides a vehicle for public participation and serves as a check upon the integrity of the judicial process thereby augmenting the public's confidence in judicial proceedings. The Post–Dispatch seeks access to the Underlying Documents on the ground that they are judicial records. The Post–Dispatch bases its argument on the premise that the Examiner is a judicial officer and therefore all documents in his custody, the Underlying Documents, constitute judicial records. As such, the Post–

Dispatch concludes the Debtors and Third Parties must demonstrate a compelling reason for the issuance of the Agreed Order,[8] and the Agreed Order must be narrowly drafted in furtherance of its ends.[9]

At the outset, this Court notes that the common law right of access to judicial records is not absolute. *U.S. v. Webbe,* 791 F.2d 103, 106 (8th Cir.1986) (*citing, Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 55 L.Ed.2d 570 (1978)). The 8th Circuit has declined to employ a "strong presumption" in favor of the common law right of access. *Webbe* at 106. Rather, our appellate court places heavy reliance on the opinion of trial judges when the decision of whether or not to issue a protective order concerns the efficient administration of justice. *Webbe* at 106. In the instant case, judicial economy necessitated the institution of the protective order and the Agreed Order properly denies public access to the Underlying Documents.

### 1) The Underlying Documents Are Not Judicial Records

#### a) *By Their Nature The Documents Are Not Judicial Records*

The purpose of § 107 is to safeguard the policy of access to court records. *In re Analytical Systems, Inc.,* 83 B.R. 833, 835 (Bkrtcy.N.D.Ga.1987). Section 107(a) of the Code provides that papers filed in a case under Title 11 are public records and open to examination. The Post–Dispatch argues that the Underlying Documents must be available to the public unless they are subject to the § 107(b) exception. The Post–Dispatch objects to the "broad classification of (the Underlying Documents) as 'highly confidential commercial information'", See *Reply Brief In Support Of Movant's Motion To Vacate, Or In The*

---

**6.** Section 107(a) provides that "except as provided in subsection (b) of this section, a paper filed in a case under this title ... are public records and open to examination by an entity ...".

**7.** The Debtors and Third Parties argue that the Post–Dispatch's request to participate in any in camera review of documents is moot, as no request to seal documents has yet been filed.

Nonetheless, in the attached Order, this Court has established procedures to facilitate such review.

**8.** See *Post–Dispatch Motion,* p. 16.

**9.** See *Post–Dispatch Motion,* p. 19.

*Alternative, Reconsider And Clarify The Agreed Order*, p. 4, arguing that the limitation of judicial records in excess of the specific items listed in § 107(b) violates the First Amendment. See *Post–Dispatch Motion* p. 13.

This Court determines that the Underlying Documents are not subject to § 107(a) because they have not been, and will not be, filed. The plain language of § 107 establishes standards only for those documents *which are filed with the court.* To the extent the Underlying Documents are not filed, they are not subject to the § 107(a) requirements.

The fact that the Underlying Documents will not be filed with the Court, however, does not instantaneously embrace the conclusion that they are not judicial records. Blacks Law Dictionary defines judicial records as "dockets or records of judicial proceedings". *Blacks Law Dictionary*, p. 762 (5th Ed.1979). Conceivably then, there are judicial records which have not been filed with the court.

The Post–Dispatch argues that documents upon which a court relies in making a legal determination are judicial records and are subject to public access. In so arguing, the Post–Dispatch relies on *F.T.C. v. Standard Financial Management Corp.*, 830 F.2d 404 (1st Cir.1987) for the proposition that financial statements used by the court in determining the reasonableness of a proposed settlement agreement between the bankrupt and non-bankrupt parties were subject to public access. *F.T.C.* at 413. The Post–Dispatch argues that the Examiner is evaluating the merits of the Release Motion just as the court in *F.T.C.* was examining the merits of the settlement agreement. The documents in the instant case, according to the Post–Dispatch, are being relied upon by the Court in the resolution of substantive legal rights and are subject to public scrutiny.

At the outset, *F.T.C.* is distinguishable from the case at bar in that it presumes the very fact which the Post–Dispatch must prove. The *F.T.C.* court found that only a "compelling reason" could justify non-disclosure of judicial records. *F.T.C.* at 410. That is, the *F.T.C.* case presumes that the documents in question constitute judicial records. This Court, however, finds that the Underlying Documents are *not* judicial records. Furthermore, this Court believes that the "compelling reason" test is not the proper test for determining the appropriateness of a protective order on *pretrial discovery.* The Supreme Court has held in *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984) that a court need only show "good cause" for issuing a protective order on pretrial discovery. See *infra* p. 101.

*F.T.C.* is further distinguishable from the facts in the instant case in that the Court is not relying on the Underlying Documents for the determination of any substantive rights. Unlike in *F.T.C.*, this Court will only receive the Underlying Documents (or portions thereof) which may be attached as exhibits to the Examiner's Report. The ultimate purpose of the Report is not to evaluate the merits of the Release Motion but to qualify a disclosure statement for Apex's creditors.

While the Release Motion itself has not been withdrawn, the offer by Messrs. Novelly and Goldstein to pay Apex in exchange for the releases has been withdrawn. The Examiner, then, is not evaluating the propriety of the Release Motion. Rather, the Examiner is using the Underlying Documents as a source by which he will draft a Report. This Report will then be incorporated into the disclosure statement, and the purpose of the disclosure statement is not to determine substantive rights. The disclosure statement is primarily a source of information upon which creditors make an informed judgment about the merits of a plan of reorganization. *In re Ralph Carl Jeppson*, 66 B.R. 269, 15 BCD 84, 94 (D.Utah, 1986). Thus, the Underlying Documents serve only to provide information to the Debtors' creditors. They are not used in determining substantive rights, and such documents which play no role in the adjudicative pro-

cess lie beyond the public's reach. *F.T.C.* at 408.[10]

### b) *The Examiner's Role Does Not Convert The Underlying Documents To Judicial Records*

The Post–Dispatch also argues that the Underlying Documents are judicial records because the Examiner is an officer of the Court by virtue of his appointment under §§ 1104 and 1106 of the Code. The Post–Dispatch extrapolates that as an officer of the Court the Examiner is an "extension" of the Court, and as such his "request and receipt of documents and his taking of depositions makes these documents and depositions judicial records subject to public access." See *Post–Dispatch Motion*, p. 23.

This Court rejects the Post–Dispatch's presumption that the Examiner is an extension of the Court. While the Examiner is an officer of the Court, he has no more rights and responsibilities than any other attorney also bearing the denomination of "officer of the court". The Examiner's findings are no more binding on the Court than those of other attorney's. "While § 1106 requires the Examiner to file a 'statement' of his investigation, his findings do not have a binding effect on the Court." *In the Matter of Baldwin United Corporation*, 46 B.R. 314, 316 (Bkrtcy.S.D. Ohio 1985).

"The primary function of an examiner is to investigate the debtor's actions, financial condition, as is appropriate under the particular circumstances of the case including any allegations of fraud, dishonesty or gross mismanagement of the debtor by current or former management." *In re Gilman Services, Inc.*, 46 B.R. 322, 327 (Bkrtcy.D.Mass.1985). The Examiner is appointed to act as an independent party to review, without monetary interest, transactions and documents. He is "first and foremost disinterested and nonadversarial. The benefits of his investigative efforts flow solely to the debtor and to its creditors and shareholders ..." *Baldwin* at 316. The Examiner, then, disseminates information to the creditors in a nonadversarial context. He is a fact-finder in the colloquial sense of the term. The Examiner discovers facts for the benefit of the creditors as directed by the Court. He does not, however, issue judicial "findings of fact" as a court does under F.R.B.P. 7052. It follows then, that while the Examiner may be appointed by the Court, he is so appointed to assist parties other than the Court. He is not an extension of the Court. The Examiner's mere review of documents in a F.R.B.P. 2004 examination does not "elevate" the documents to the status of judicial records.

In support of its position, the Post–Dispatch cites *In re Robert Landau Associates, Inc.*, 50 B.R. 670 (Bkrtcy.S.D.N.Y. 1985), for the proposition that transcripts and exhibits produced at a F.R.B.P. 2004 examination cannot be sealed.[11] In *Landau* the Bankruptcy Court reviewed an order sealing a deposition taken of the debtor's principal. The court found that the protective order was not properly entered based on six factors which it reviewed extensively. Among these was the fact that the protective order in question permitted extensive third party access to the documents in question and did not permit similar access by the debtor. The *Landau* Court found that the protective order was specifically tailored to prevent the debtor from viewing the documents. Moreover, the documents in question were not produced in reliance on their confidentiality.

---

**10.** Only if an adversary action is brought against the Debtors or Third Parties would the Underlying Documents become part of the adjudicatory process. If so, they may then be publicly circulated. Until that time, however, the Underlying Documents are not judicial records in that they have not been filed and they are not being used by proponents in the resolution of substantive legal rights.

**11.** The Court recognizes that the *Landau* case does not support the proposition that as an extension of the Court, the Examiner's Underlying Documents are subject to public access. The Post–Dispatch, however, discusses the *Landau* case at pages 23–24 of its Motion, in the subsection entitled "Examiner Is An Officer And Extension Of The Court And Documents Provided to Examiner Are Judicial Records". In deference to the Post–Dispatch, then, the Court shall respond to the *Landau* case when discussing the same issue.

Rather, they were produced in exchange for a promise of criminal immunity. Contrary to the proposition of law offered by the Post–Dispatch, the *Landau* court concluded that while it had the "inherent authority" to seal testimony and enter an order of confidentiality, the *particular* order in question was inappropriate. *Landau* at 677. (emphasis added).

The *Landau* court also found that under § 105 of the Code it had the authority to issue protective orders when the issuance of such an order was warranted. *Landau* at 675. According to the *Landau* court relief under § 105 must be sought in conjunction with other statutory authority. *Landau* at 674. The *Landau* court found that the protective order in question was not warranted because it lacked a statutory basis. The trustee in *Landau* had argued that § 107(b) of the Code provided the appropriate statutory basis for a protective order, but the court rejected that argument, stating that § 107(b) does not specifically provide for the issuance of a protective order.

The court neither discussed nor considered, nor did the trustee in *Landau* argue, however, that § 1106 of the Code offers the appropriate statutory basis for employing § 105 in the issuance of protective orders. Section 1106(a)(3) and (4) of the Code directs the Examiner to investigate and prepare a report on the "acts, conduct, assets, liabilities, and financial condition of the debtor ...". Section 105(a) of the Code authorizes the Court to "issue any order ... necessary or appropriate to carry out the provisions of this title". This Court finds that issuance of the Agreed Order No. 1 was necessary to enable the Examiner to prepare his Report as authorized under § 1106. Consequently, the Court holds that § 1106 provides the appropriate statutory basis for enacting a protective order under § 105 of the Code.

Additionally, the Post–Dispatch argues that *Landau* stands for the proposition that "Rule 7026 cannot be the basis for a

protective order sealing documents." *Post–Dispatch Motion*, p. 24. The trustee in *Landau* had also argued that F.R.B.P. 7026 was the appropriate authority for the application of a protective order under § 105 of the Code. The *Landau* court rejected that argument, stating that the trustee was not conducting discovery based on F.R.B.P. 7026, but rather was conducting a F.R.B.P. 2004 examination. Consequently, the court concluded that F.R.B.P. 7026 was not the appropriate authority for issuing a protective order.

The Post–Dispatch asks this Court to apply the same conclusion to the facts in the instant case. This Court, however, declines to do so. While the Examiner in the Apex cases is also conducting a F.R.B.P. 2004 investigation, the Court notes that the Debtors and Third Parties objected to the Apex Examiner's F.R.B.P. 2004 Motion and subpoenas. Thus the Debtors and Third Parties contested the Examiner's Motion to conduct a F.R.B.P. 2004 examination. Whenever there is an actual dispute other than an adversarial proceeding, the litigation to resolve that dispute is a contested matter. *Colliers on Bankruptcy* 15th Ed. Appendix 1, p. 1475. F.R.B.P. 9014 provides that in a contested matter, F.R.B.P. 7026 applies. F.R.B.P. 7026 adopts F.R. C.P. 26 which authorizes in subsection (c) the issuance of protective orders. Thus in the resolution of a contested motion to conduct a F.R.B.P. 2004 examination, this Court finds that F.R.B.P. 9014, (which employs F.R.B.P. 7026) is an appropriate statutory basis for a protective order.[12]

In conclusion then, this Court finds that it has the authority under § 105 of the Code and F.R.B.P. 9014 and 7026 to issue protective orders. Section 105 authorizes the Court to do what is necessary to carry out the provisions of the Code, and F.R.B.P. 9014 authorizes the employment of F.R.B.P. 7026 in a contested matter. Additionally however, the *Landau* court specifically stated that courts possess the *inherent* authority to seal testimony and enter

12. This Court notes that the facts in the instant case are distinguishable from those facing the *Landau* court. In *Landau,* the trustee's motion to conduct a F.R.B.P. 2004 examination, and the subpoenas issued thereunder, were not contested.

orders of confidentially. *Landau* at 677. (emphasis added). This court concludes that there is ample support for its issuance of Agreed Order No 1.

2) The Underlying Documents Are Subject To A Protective Order

The public has rights of access to non-judicial records under certain circumstances. The Supreme Court has addressed protective orders which seal pretrial discovery obtained through F.R.C.P. 26 and has found such orders to be valid if good cause is shown for their institution. *Seattle Times Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984). This Court now considers protective orders issued with respect to F.R.B.P. 2004 discovery and finds that a similar standard applies. Protective orders over F.R.B.P. 2004 discovery are valid when issued for good cause.

a) *F.R.C.P. 26 Discovery May Be Protected For Good Cause*

The Supreme Court has held in the leading case of *Seattle Time Co. v. Rhinehart*, 467 U.S. 20, 104 S.Ct. 2199, 81 L.Ed.2d 17 (1984), that there is no First Amendment right of access to information made available only for purposes of trying a law suit. *Seattle* 104 S.Ct. at 2207. Pretrial depositions and interrogatories were not historically public components of a civil trial. *Seattle* 104 S.Ct. at 2207. Rather, the Court found that access to a litigant's private property is by legislative grace.

In *Seattle Times*, the Supreme Court considered whether a litigant could publicize information acquired through the discovery process. Because of the potential for abuse, the Court found that trial courts have the authority to curb the liberal discovery rules permitted by F.R.C.P. 26(b)(1) by issuing protective orders pursuant to F.R.C.P. 26(c). The Court was concerned with the problems and expense associated with the delays of uncontrolled discovery. *Seattle* 104 S.Ct. at 2208. "Much of the information that surfaces during pretrial discovery may be unrelated, or only tangentially related to the underlying cause of action. Therefore, restraints placed on discovered, but not yet admitted information are not a restriction on a traditionally public source of information." *Seattle* 104 S.Ct. at 2208.

The Supreme Court also expressed concern that excessive discovery would jeopardize a litigant's or third party's privacy interest. *Seattle* 104 S.Ct. at 2208. A litigant's interest in avoiding public disclosure of private information is grounded in the Constitution, federal statutes and common law. *Tavoulareas v. Washington Post Co.*, 724 F.2d 1010, 1019 (D.C.Cir. 1984). The Supreme Court has reaffirmed that one element of privacy is an individual's interest in avoiding disclosure of personal matters revealed in discovery but not made public at trial. *Tavoulareas* at 1019 (*citing, Nixon v. Administrator of General Services*, 433 U.S. 425, 97 S.Ct. 2777, 53 L.Ed.2d 867 (1977)). Thus, the Court concluded that the government has a clear and substantial interest in preventing the release of information that could be damaging to reputation and privacy. *Seattle* 104 S.Ct. at 2209. Protective orders prevent discovery from being used as a club by threatening disclosure of matters which will never be used at trial. *Joy v. North*, 692 F.2d 880, 893 (2nd Cir.1982).

In establishing a protective order on pretrial discovery, a trial court balances the litigants right to privacy versus the common law right of access. Since the Supreme Court held that there is no First Amendment right of public access, the trial court need not apply close or heightened scrutiny. Rather, the Supreme Court has declared that the appropriate standard in evaluating protective orders is the "good cause" standard found in F.R.C.P. 26(c). For good cause a trial court may impose a protective order on pretrial discovery, F.R.C.P. 26(c) conferring broad discretion on the court to decide when a protective order is appropriate and what degree of protection is required. *Seattle* 104 S.Ct. at 2209.

Furthermore, judicial economy is an appropriate consideration in drafting protective orders, and umbrella orders offer an appropriate remedy. In *In re Alexander*

*Grant & Co. Litigation*, 820 F.2d 352, 356–357 (11th Cir.1987), the Court considered the appropriateness of a protective order over documents produced in discovery and designated confidential by the producing party. The court concluded that:

> ... in complex litigation where document-by-document review of discovery materials would be unpracticable, and when the parties consent to an umbrella order restricting access to sensitive information in order to encourage maximum participation in the discovery process, conserve judicial resources and prevent the abuses of annoyances, oppression and embarrassment, a district court may find good cause and issue a protective order pursuant to Rule 26(c).

An umbrella order such as Agreed Order No. 1 which establishes a procedure for the protection of private documents en mass, then, may be appropriate and valid.

### b) *F.R.B.P. 2004 Discovery May Be Protected For Good Cause*

The same policies supporting the issuance of a F.R.C.P. 26 protective order apply toward the establishment of a F.R.B.P. 2004 protective order. Agreed Order No. 1 facilitates the production of documents and taking of depositions, promotes judicial economy and has been relied upon for nearly three months by all parties in interest. Furthermore, both litigants and non-litigants have a recognized interest in protecting private affairs that are revealed in discovery but not made public at trial. This is especially true in light of the fact that: 1) the Underlying Documents will not be considered by this Court in any judicial determinations, and 2) the scope of F.R.B.P. 2004 investigation is broader than that of F.R.C.P. 26 discovery. This Court, therefore, finds good cause supporting the institution of Agreed Order No. 1.

"If the purpose of the common law right of access is to check judicial abuses, then that right should extend only to materials upon which a judicial decision is based." *Tavoulareas* at 1016. Documents collected through F.R.C.P. 26 discovery may never be produced at trial and considered by the Court in resolving legal disputes. Documents and depositions collected through a F.R.B.P. 2004 investigation are less likely to be used in resolving substantive rights because the purpose of the investigation is to locate assets of a debtor's estate for the benefit of its creditors, not initiate a cause of action. *In re Mantolesky*, 14 B.R. 973, 976 (D.Mass.1981) (*citing*, 12 *Collier on Bankruptcy* ¶ 205.15 at p. 2–93 (14th Ed. 1979)). This is especially true in the instant case where the fruits of the F.R.B.P. 2004 investigation will be incorporated into a disclosure statement for the benefit of the Debtor's creditors and will not be relied upon by this Court in making any judicial determination of substantive rights. The smaller the role documents play in the adjudicative process, the less of an interest the public has in them.

The broad nature of the F.R.B.P. 2004 investigation also dictates against public disclosure of the Underlying Documents. F.R.B.P. 2004 provides, in pertinent part, that upon a "motion of any party in interest, the court may order an examination of any person." *In re Analytical Systems, Inc.*, 71 B.R. 408, 411 (Bkrtcy.N.D.Ga. 1987). It is well established that the scope of such an investigation is broad. The exploration can be in the nature of a fishing expedition. *In re Vantage Petroleum Corp.*, 34 B.R. 650 (Bkrtcy.E.D.N.Y.1983). The examination may be exploratory and groping and may be as searching to him as appears proper. *Vantage* at 651 (*citing, Sachs v. Hadden*, 173 F.2d 929, 931 (2nd Cir.1949). It may include the examination of the debtor and *third parties* concerning the debtor's assets and affairs. *Analytical* at 411, (emphasis added). The purpose of the F.R.B.P. 2004 investigation is to aid in the discovery of assets, and if a third person can be shown to have a relationship with the debtor's affairs, the party is subject to the F.R.B.P. 2004 investigation. *Mantolesky* at 977.

The scope of a F.R.B.P. 2004 examination, then, is broader than the scope of discovery under F.R.C.P. 26. Consequently, third parties have a greater interest in protecting their privacy than a litigant, for

they never subjected themselves to the mercy of the judicial system. Having conducted business with a debtor cannot be the sole basis for allowing the public to scrutinize the private affairs of third parties. While the press has an acknowledged right to report on public activities, such as a trial, it has less of a right to exploit bankruptcy procedures as a means of delving into the private financial affairs of third parties. While third parties may be subject to the jurisdiction of the court under F.R.B.P. 2004, they should be insulated from the public forum when their personal documents do not constitute judicial records and they are not parties to litigation.

Moreover, the Post–Dispatch may not ask this Court to unravel an agreement designed to facilitate the Examiner's timely completion of his Report. Many of the Third Parties are foreign corporations and their officers are not American citizens. In objecting to the Examiner's F.R.B.P. 2004 subpoenas, these Third Parties challenged the Court's jurisdiction over them and their papers. Additionally, both the Debtors and Third Parties objected to the scope of the Examiner's subpoenas. They all asserted that compliance would be costly and time consuming in that they would challenge the Examiner's authority to access confidential records. Had a procedure for the cooperative exchange of documents and depositions not been established, protracted legal battles would have ensued. This Court would have been required to make a judicial determination on every objection relating to confidentiality and jurisdiction. A multi-year review of the business transactions of 54 Debtors and approximately 37 non-debtor affiliates would make this task one of titanic proportions, unduly burdening the Court's time and energies. Clearly, it would delay the progression of the Apex reorganization.

To facilitate the Examiner's efforts then, the Debtors and Third Parties established the procedures outlined in the Agreed Order. Such comprehensive mechanisms are appropriate in that judicial economy is a proper motivation for their institution.

The realities of today's world have shown that discovery and the exchange of information can become extremely difficult. Busy courts are simply unable to hold hearings every time someone wants to obtain judicial review concerning the nature of a particular document. The order issued in this case as in others, is designed to encourage and simplify the exchanging of large numbers of documents, volumes of records and extensive files without concern of improper disclosure. After this sifting, material can be "filed" for whatever purpose consistent with the issues being litigated whether by pretrial hearing or an actual trial. Judicial review will then be limited to those materials relevant to the legal issues raised. History has confirmed the tremendous saving of time effected by such an approach. The objective is to speed up discovery.

*In re Alexander Grant & Co. Litigation,* 820 F.2d 352, 356–357 (11th Cir.1987).

The Debtors and Third Parties have agreed to freely hand over their records without the necessity of judicial intervention at each step along the road. This Court has a valid interest in protecting the legitimate privacy interests of the Debtors and Third Parties who are not currently involved in litigation and have no substantive legal rights at issue. If there is no absolute constitutional right to pretrial discovery gathered for the purpose of resolving substantive legal rights, then certainly there is no absolute constitutional right to discovery gathered solely for the purpose of educating the creditors. Agreed Order No. 1 which is based on good cause, promotes judicial economy and guards against intrusions into private affairs, is valid and enforceable.

## CONCLUSION

██ Once a confidentiality order has been entered and relied upon, it can only be modified if an "extraordinary circumstance" or "compelling need" warrants the requested modification. *Federal Deposit Insurance Corporation v. Ernst & Ernst,* 677 F.2d 230, 232 (2nd Cir.1982) (*citing*

*Martindell v. International Telephone & Telegraph Corp.,* 594 F.2d 291, 296 (2nd Cir.1979)). The prospect of the Examiner being required to indiscriminately produce investigative materials obtained through promises of confidentiality and reliance upon this Court's orders, raises grave concerns touching both the integrity of the Bankruptcy Court's processes, as well as the integrity of the statutory position of the Examiner. In the *Matter of Baldwin United Corp.,* 46 B.R. 314, 316 (Bkrtcy.W. D.Ohio 1985). The Post–Dispatch has not presented this Court with evidence amounting to "extraordinary circumstances" or a "compelling need" to justify modifying Agreed Order No. 1. The First Amendment rights upon which they rely are inapplicable to the F.R.B.P. 2004 examination under the circumstances of this case.

The Post–Dispatch is prohibited from reviewing the pool of private information from which the Examiner will draw documentation supporting his Report. Moreover, the Post–Dispatch may not view the unedited version of Examiner's Report until the parties who are the subject of the Report and have a legitimate interest in protecting their private affairs from public disclosure, have had an opportunity to review and request relief. The Post–Dispatch will, however, be permitted to respond to any requests to seal documents filed with the Court. These prohibitions do not just apply to the Post–Dispatch. Rather, they apply to the Committee, Apex's creditors and all parties in interest as well. The Post–Dispatch will not be afforded any greater rights than those whose financial well-being is at risk.