**In re EPIC ASSOCIATES V, et al., Debtors.**

**Bankruptcy Nos. 85–01306–A through 86–01646–A and 85–01724–A through 85–01739–A.**

United States Bankruptcy Court,
E.D. Virginia,
Alexandria Division.

Oct. 28, 1985.

---

Roger M. Whelan, Verner, Liipfert, Bernhard, McPherson & Alexandria, Washington, D.C., and Raymond E. Vickery, Jr., Reed, Smith, Shaw & McClay, McLean, Va., for debtors.

Warren Dennis, Joseph A. Fanone, Ballard, Spahr, Andrews & Ingersoll, Washington, D.C., and Michael McGettigan, Murphy, McGettigan & West, P.C., Alexandria, Va., for The First National Bank of Maryland.

Joseph D. Tydings, Robert Plotkin, Michael V. Blumenthal, Finley, Kumble, Wagner, Heine, Underberg, Manley & Casey, Washington, D.C., and Randolph A. Sutliff, Miles & Stockbridge, Fairfax, Va., for The National Bank of Washington.

Boisfeuillet Jones, Jr., Carol D. Melame, Patrick J. Carome, Washington, D.C., for The Washington Post Co.

George Freeman, New York City, and Lynn A. Stout, Atty-at-Law, Alexandria, Va., Local Counsel for The Washington Post Co. and The New York Times Co.

Norman Oliver, Alexandria, Va., for the United States trustee.

## MEMORANDUM OPINION

MARTIN V.B. BOSTETTER, Jr., Chief Judge.

On October 11, 1985, this Court entered a protective order sealing certain pleadings and portions of the schedules and statements of affairs in this case. National Bank of Washington and First National Bank of Maryland, trustees ("the trustees") of the Mortgage Pass-Through Certificateholders ("the Certificateholders") had requested the protective order, asserting an emergency. Among the Certificateholders are 59 savings and loan institutions. Prior thereto, the debtors, EPIC Associates V, et al. ("EPIC Associates"), had filed petitions for reorganization under Chapter 11 of the Bankruptcy Reform Act of 1978 ("the Code") on September 5, 1985 and later several additional petitions on September 19, 1985 after defaulting on mortgage payments to the Certificateholders and to institutions directly holding mortgages on some of the over 20,000 residential properties owned by EPIC Associ-

ates. The protective order was signed and entered after an *in camera* hearing in order to keep confidential the identities of various savings institutions holding EPIC Associates mortgages or mortgage-backed certificates. Confidentiality was deemed necessary because of the possibility that public disclosure of the identities of institutions holding EPIC paper would cause a loss of public confidence in those institutions and trigger runs of withdrawals by their customers. The order is effective only until November 15, 1985, at which time the Court will determine whether the order should be modified or extended.

On the same day the protective order was entered, October 11, 1985, *The Washington Post* Company ("the Post") sought leave to intervene for the limited purpose of being heard on the issue of public access to the sealed court records [1]. The Post also requested an expedited hearing to determine whether the protective order should be vacated.

A hearing on the Post's motion was conducted on October 21, 1985. The Post presented no testimony but asserted that section 107 of the Code, a codification of the common law right of access to court records, mandated public disclosure of the sealed information. *See In re Nunn*, 49 B.R. 963, 964 (Bankr.E.D.Va.1985). The trustees countered not only with legal argument but with evidence in the form of testimony by expert witnesses.

■ This Court formally granted the Post's motion to intervene prior to hearing the closing arguments on the merits of the motion to vacate the protective order. Section 107(a) of the Code creates a presumption in favor of public access to court records: "[e]xcept as provided in subsection (b) of this section, a paper filed in a case under this title and the dockets of a bankruptcy court are public records and open to examination by an entity at reasonable times without charge." When a court

1. *The New York Times* Company joined in this motion but did not participate in the hearing and argument on the motion.

entertains a motion to deny public access under section 107(b), the public—as represented in this case by the Post—must be allowed to intervene and be heard. It appears clear that the right of intervention must be granted; otherwise the decision of the Court could be shielded from effective review and, thus, without a right to intervene, the public would have no way to protect its broad right of access granted by section 107(a) and the common law. Furthermore, the Fourth Circuit Court of Appeals has ruled that the public is entitled to notice of and an opportunity to object to a request to seal court records. *In re Knight Publishing Co.,* 743 F.2d 231, 235 (4th Cir.1984). The decision to seal documents should not be made without the benefit of counter-arguments in favor of access. *Id.; In re Knoxville News-Sentinel Co., Inc.,* 723 F.2d 470, 474–76 (6th Cir.1983). *See also Matter of DeLorean Motor Co.,* 31 B.R. 53 (Bankr.E.D.Mich. 1983) (Associated Press appeared at an "open hearing" on DeLorean's motion for protective order).

As noted above, section 107(a) creates a presumption in favor of public access to court records. Section 107(b)(1) provides a relevant exception, however:

> (b) On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—
>
> (1) protect an entity with respect to a trade secret or confidential research, development, or commercial information....

11 U.S.C. § 107(b). Bankruptcy Rule 1007(j) implements section 107(b)(1) by allowing the court, after a "motion of a party in interest and for cause shown," to impound lists filed pursuant to Rule 1007. These lists include schedules revealing the identities of all creditors, schedules of assets and liabilities, and statements of financial affairs. Bankr.R. 1007(b).

When sealing the records pursuant to the order of October 11, 1985, this Court was

satisfied from information offered in support of the trustees' motion for the order that cause existed for this extraordinary measure. Mindful of the runs of withdrawals experienced by the Maryland savings and loan institution that controls Equity Programs Investment Corporation[2], the Court concluded that the risk of similar occurrences at other savings and loans merited temporarily keeping under seal the identities of the Certificateholders and of the institutions directly holding mortgages on EPIC Associates' property. After hearing the arguments and evidence presented at the hearing on the Post's motion, the Court remains convinced that the original order should continue in full force and effect until further consideration on November 15, 1985. Information regarding the identities of the institutional creditors must be protected from disclosure in order to protect the innocent depositors of these savings and loan institutions and the innocent taxpayers of the State of Maryland, who may be forced to insure some of the accounts in Maryland savings and loan institutions.

It is a highly unusual and extraordinary remedy for the Court to seal the records in any case because of the generally-recognized rule of law that the public has a right to know. However, this is a highly unusual and extraordinary case. More than 100 financial institutions are involved as creditors of EPIC Associates. The structure formed by these institutions can be likened to a house of cards. In the instant case, sophisticated financial tiers lie one upon the other. If the identities of the institutional lenders and the extent of their investments in EPIC Associates' properties are disclosed, runs on these institutions as well as non-related lending institutions could cause the collapse of one or more of them. The collapse of even one could have far-ranging consequences.

■ Although sealing the financial information sought by the Post may facilitate the rehabilitation of the debtors, the

**2.** Equity Programs Investment Corporation, a subsidiary of Community Savings and Loan, is

the general partner of each of the 357 debtors in this case.

present order is not predicated on that factor. Records cannot be sealed on that basis alone. In denying the Post's motion to vacate the protective order, the Court believes that the savings and loan institutions and their innocent depositors must be protected. Indeed, the danger extends to institutions other than those actually holding EPIC Associates' paper. Expert testimony from Mr. Thomas L. Batties, Chief Superintendent and Chief Counsel of the Ohio Department of Commerce's Division of Savings and Loan Associations, and from Mr. Arthur M. Weimer, holder of a Ph.D. in Economics from the University of Chicago, former Dean of the School of Business at Indiana University, and former director of two savings and loan associations, indicated that institutions having no connection whatsoever with EPIC Associates could suffer if the list of institutional creditors in this case is disclosed.

Mr. Batties was intimately involved with the savings and loan crisis experienced by the State of Ohio last March. Mr. Batties testified, having qualified as an expert witness, that in his opinion inaccurate Ohio newspaper accounts concerning bankruptcy court records filed in the ESM Government Securities of Florida case contributed to runs on Home State Savings Bank, a creditor of ESM's. Runs then developed on other Ohio savings and loan institutions, ultimately resulting in the collapse of the Ohio deposit insurance system and in forced bank "holidays." Mr. Batties further testified that the EPIC Associates situation is markedly similar to the one existing in Ohio last Spring.

Professor Weimer, who also qualified as an expert witness, drawing from a lifetime of study and expertise, placed the instant situation in historical perspective. His most telling testimony concerned the "psychology of the depositor." According to Professor Weimer, the recent savings and loan crises in Ohio and Maryland have created a climate that would make runs on area banks reasonably probable if the information requested by the Post is disclosed. Professor Weimer testified further on cross examination that, in such a vola-tile atmosphere, a run could result from panic, not from decisions based on actual financial information. In addition he confirmed Mr. Batties' testimony that not even a federally-insured bank can maintain liquidity if victimized by a classic run.

■ The Post has asserted that neither witness has made an extensive study of the facts of the EPIC Associates case. Nevertheless, these witnesses are experts in their field and are sufficiently familiar with the necessary circumstances and, thus, are entitled to draw conclusions about this case based on their experience and knowledge of other cases. This Court is satisfied that both Mr. Batties and Professor Weimer had such knowledge of the relevant facts in this case as would allow them to express reasonably accurate conclusions about the disclosure issue. *See Horton v. W.T. Grant Co.*, 537 F.2d 1215, 1218 (4th Cir. 1976). The inescapable conclusion from this testimony of the expert witnesses is that there is a high possibility and indeed a sufficient probability that there will be a run on the banks in this area should the information now under seal be disclosed by way of lifting the protective order.

■ During the hearing, the Post adamantly asserted that the information under seal was not "commercial information" entitled to protection by section 107(b)(1). The Code does not define "commercial information." Few opinions construing section 107 have been published, and none contains facts even remotely resembling the exceptional circumstances of the case at bar.

Protective orders have been denied when they were sought merely to facilitate the debtors' reorganization, *In re Itel Corp.*, 17 B.R. 942 (Bankr. 9th Cir.1982), or to assuage a defendant's fears that disclosure of the allegations in an adversary complaint would adversely affect its business activities, *Hope on Behalf of Clark v. Pearson*, 38 B.R. 423 (Bankr.M.D.Ga.1984). But this Court recently granted a protective order when the debtor's schedules revealed a broker-creditor's only asset, its

**450**

customer list, because disclosure of this list to a competitor would adversely affect the creditor. *In re Nunn,* 49 B.R. 963, 965 (Bankr.E.D.Va.1985). The customer list clearly fell within the "commercial information" exception to public access found in section 107(b)(1). The Court believes that the records currently under seal constitute "commercial information" deserving the protection Congress provided under section 107(b)(1).

■ In addition and equally as important, this Court feels, under the circumstances of this case, that it must exercise the inherent supervisory power that it holds over its own records and files. The common law right of the public to inspect and copy court records is not absolute. *Nixon v. Warner Communications, Inc.,* 435 U.S. 589, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978). Whether to allow or deny access is a decision "best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Id.,* 98 S.Ct. at 1312–13. The trial court must weigh the parties' interests "in light of the public interest and the duties of the courts." *Id.* at 1314.

■ Providing a gloss on the *Nixon* standards, the Fourth Circuit has admonished trial courts granting sealing orders to support their decisions with specific findings. *In re Knight, supra,* 743 F.2d at 235. Less restrictive alternatives to the closure order must be considered and rejected. *Id.* Accordingly, this Court finds that dissemination of the information currently under seal would pose substantial harm to EPIC Associates' institutional creditors and substantial damage to nonconnected financial institutions as well as the public, including both innocent depositors and taxpayers. The testimony of Thomas L. Batties and Arthur M. Weimer is clear and convincing on this issue. Furthermore, the Court has looked for less restrictive alternatives; none is available. When the protective order sought to be vacated by the Post was entered on October 11, 1985, it was limited by the Court so

as to expire on November 15, 1985. This order represents the narrowest restriction on access that is possible. It is imperative to excise only certain information from the schedules and other filings in this case, and only that information has been excised.

The Court finds no other way of adequately protecting the public than by the October 11, 1985 order, and finds further that there is a substantial possibility that this order will achieve its intended purpose. Accordingly, an order will be entered permitting *The Washington Post* and *The New York Times* the right to intervene and continuing the protective order until November 15, 1985, when the propriety of continuing the protective order will be considered further.