In re 50–OFF STORES, INC., A Delaware Corporation, 50–Off Multistate Operations, Inc., A Nevada Corporation, 50–Off Texas Stores, L.P., A Texas Limited Partnership, 50–Off Operating Co., Inc., A Nevada Corporation, Debtors.

Bankruptcy Nos. 96–54430–C to 96–54433–K.

United States Bankruptcy Court, W.D. Texas, San Antonio Division.

Sept. 12, 1997.

## DECISION AND ORDER ON MOTION TO MODIFY ORDER SEALING RECORD

LEIF M. CLARK, Bankruptcy Judge.

CAME ON for hearing the motions of Jefferies & Company, Inc. and Jefferies International, Ltd. (collectively "Jefferies") [# 777–1] and of Banque Paribas (Suisse) S.A. ("BPS") [# 775] to Modify an Order of this Court [# 169] sealing the proceedings relating to the retention of Akin, Gump, Strauss, Hauer & Feld as special counsel for the debtor pursuant to 11 U.S.C. § 107(b). The movants are defendants in two separate pieces of litigation in which the estate is the plaintiff. An action is pending against Jefferies in state court in Bexar County, while an action is similarly pending against BPS in federal district court within this district and division.[1]

### *Background*

Prior to the bankruptcy filing of 50–Off, that company had attempted to sell some shares of stock to raise capital. According to BPS, an offering was made through Jefferies (its placement agent) to offshore investors pursuant to SEC Regulation S. Approximately 1.5 million shares of common stock were the subject of a subscription agreement by certain offshore entities, with the stock to be sold to certain offshore investors. The stock certificates were prepared without the required restrictive legend, and placed into an escrow with a 40 day advisory stop transfer instruction on the shares, running from the date of issuance. The shares were transferred to Chase Bank (not a named party in

---

1. BPS is a defendant in Civ. Action No. SA–95CA–0159, *50–Off Stores Inc. v. Banque Paribus (Suisse) SA et al.*, set for trial on October 14,- 1997, with the deadline for submission of the Pretrial Order set for September 15, 1997.

the litigation), without a bank payment guarantee. The shares were transferred from Chase to BPS, the depository bank of one of the parties to one of the subscription agreements. The shares were never paid for, and this litigation ensued. 50–Off claims that Jefferies and BPS are each liable as a result of the failed transaction. Jefferies and BPS claim that 50–Off has only its own agents to blame, and its own carelessness.

One of those agents was Akin, Gump, the attorneys representing 50–Off in the offering. Akin, Gump also agreed to represent 50–Off in its lawsuit against BPS and Jefferies. Shortly after suit was filed, the bankruptcy was filed.[2] Because the Bankruptcy Code requires that an estate may only retain professionals with court approval, an application was made to retain Akin, Gump to continue its representation of the estate in the litigation against BPS and Jefferies. Concerned that many of the issues relating to retention (including consideration of various potential conflicts of interest which might arise from the suggestion that Akin, Gump might actually be a party responsible for the failed offering) might "lend aid and comfort to the enemy" (i.e., BPS and Jefferies), as it were, and equally concerned that statements and representations made in response to the court's inquiry might invade the attorney client privilege or the attorneys' work product, the debtor requested that the hearing on the retention question be sealed. The court acceded to that request. Neither BPS nor Jefferies were party to that request, nor were they given notice thereof.[3] A hearing was held, at which both argument and evidence was taken, and a decision was reached. Because of the then pending threat by BPS (and perhaps Jefferies as well) to make Akin, Gump a party to the litigation, the court deemed it wise not only to seal the proceedings but even to place under seal its ultimate disposition of those proceedings.[4] Of course, Akin, Gump continued to represent 50–Off in the litigation (and does so today), so that all parties eventually became aware de facto of the ruling of the Court.

Nearly a year passed, during which the parties engaged in extensive discovery, conducted for the most part jointly, by agreement.[5] BPS attempted to defeat 50–Off's assertion of privilege, maintaining that the assertion was a mere effort to cover up 50–Off's own negligence in the handling of the stock transaction. BPS argued that the causes of action urged by 50–Off were such as to operate as a waiver of any privilege or that such a privilege could not be allowed to stand in the way of BPS' need to prepare an adequate defense to those causes of action. Magistrate Judge Primomo turned aside these contentions, stating inter alia that "[a]lthough knowledge of the substance of privileged communications between 50–Off and its counsel would be helpful, it [was] not essential to BPS in its attempt to mount a defense in regard to the issue of reliance [on 50–Off's fraud count].... In [this] case, privileged communications are not the sole source of evidence on the issue of reliance, and 50–Off's fraud claims are not based upon the advice of counsel." Order of July 24, 1997, Civ. No. SA–95–CA–159, at 5. The court further noted that "mitigation and causation are not issues in this case ..." Id., at 9. When BPS sought copies of attorneys' bills in an unredacted format, Judge Primomo observed that "[a]ttorney fee information is discoverable, except when it would reveal

---

2. The events are not directly related, though 50–Off does maintain that, had the offering been successful, it might have avoided the need for bankruptcy protection.

3. The parties disputed this factual issue, but the record rather clearly reflects that, though Mr. Kaiser (counsel for BPS) and Mr. Schwartz (counsel for Jefferies) were aware of the closed hearing (Mr. Kaiser was in fact called to testify at that hearing as a witness), they only became aware of it after the court had already decided to seal the proceeding. There is no particular procedural error in this, as neither BPS nor Jefferies were listed as creditors of the estate, and so

would not necessarily have been entitled to notice—at least not absent their being granted an affirmative right to intervene. See FED.R.CIV.P. 24.

4. The order itself contained certain provisions which the Court deemed appropriate to shield from the defendants in the litigation, again to avoid conferring an unwarranted advantage.

5. According to 50–Off, that discovery included some six days' worth of deposition of Akin, Gump attorneys.

confidential communications or protected opinion work product." *Id.,* at 10.

BPS and Jefferies then sought to modify this Court's order sealing the retention proceedings, claiming that they ought to know more about 50–Off's federal securities claim. BPS for example states that "[c]learly, what 50–Off knew, when it knew it and what action it took with such knowledge is highly relevant to the elements of reliance, due diligence and causation." BPS Motion, at 7. BPS continues by stating its belief " . . . that because 50–Off's conduct is relevant to claims raised in the Lawsuit and defenses raised by BPS, and 50–Off acted through Akin, Gump, the proceedings and orders relative to the retention of Akin, Gump and the evidence received by the Court during those proceedings, may contain admissible evidence pertinent to the Lawsuit." Jefferies adverts to the "heavy burden the Order [sealing proceedings] places on Jefferies in the preparation of its defense to the State Court Lawsuits . . ." and adds that "the information shielded by the Order is potentially vital to Jefferies' defense. The conduct of 50–Off throughout the course of its stock offering, Akin, Gump's conduct in handling the offering, the advice given to 50–Off, and 50–Off's conduct based on the advice of its counsel during the stock transaction are all relevant to the legal issues in the State Court Lawsuit. Specifically, they are relevant to Jefferies' defense of contributory negligence and to 50–Off's failure to mitigate its alleged damages. The proceedings and orders relating to the retention of Akin, Gump and the evidence received by the Court during the sealed proceedings may contain evidence important to the State Court Lawsuit that is otherwise unavailable to Jefferies." Motion of Jefferies, at 2–3. Jefferies does not explain why such information would be "otherwise unavailable" in its motion.

50–Off counters that BPS cannot be seeking this information in order to pursue a third party action against Akin, Gump or to make Akin, Gump's actions the centerpiece of an affirmative defense, because that course has already been cut off by Magistrate Judge Primomo, who held that "[i]t is clear that BPS cannot maintain any affirmative defense that is based on the allegedly negligent conduct of Akin Gump." Judge H.F. Garcia later adopted Judge Primomo's Report and Recommendation in which this holding was incorporated. 50–Off adds that any allegation of failure to exercise due diligence premised on its lawyers' conduct must fail, under Fifth Circuit law.[6] 50–Off brushes off the contention that the matters under seal would have any impact on BPS' challenge to the claim for attorneys' fees in the district court litigation, because (a) no evidence relating to the *Johnson* factors would arise in a retention hearing and (b) this evidence is independently available in any event through direct discovery from 50–Off.

As for Jefferies' contentions, 50–Off responds that Jefferies had pleaded neither contributory negligence nor mitigation as affirmative defenses as of the time it filed its motion to modify the order sealing record, and adds that contributory negligence would not be a defense in any event to 50–Off's claims of breach of contract and breach of fiduciary duties. Finally, 50–Off brushes off as disingenuous Jefferies' concerns about evidence "otherwise unavailable" with the observation that the only impediment to Jefferies' discovery to date has been legitimately claimed attorney-client privilege and the privilege arising under the work product doctrine.

At the hearing in this matter, the parties re-urged their arguments, citing additional authorities, and presented certain documentary evidence, consisting of deposition excerpts and copies of a ruling by

---

**6.** 50–Off cites to *Trust Company of Louisiana v. N.N.P., Inc.,* 104 F.3d 1478, 1490–91 (5th Cir. 1997). The court there stated that, with respect to the due diligence element of a private cause of action under Rule 10b–5,

> The trial court found that TCL relied on its trust officer, James Crank and its attorneys, Johnson & Gibbs to properly authenticate its potential investments. That TCL's reliance

may have been misplaced does [sic] mean that it was reckless with regard to its investment, and the federal policy of deterring misconduct such as Wyshak's outweighs the policy of encouraging investors such as TCL to be more stringent in investigating their trust officers' and attorneys' advice.

*Id.*

Judge Primomo. No testimony was presented by either side. Each side maintained that the other bore the burden of proof, with 50–Off placing heavy emphasis on its belief that BPS and Jefferies had had notice of the request to seal the record and had not objected, and BPS and Jefferies countering that, under *In re Robert Landau Associates, Inc.*, 50 B.R. 670 (Bankr.S.D.N.Y.1985), that burden was placed squarely on 50–Off, precisely because they did *not* have such notice.

At the conclusion of the hearing, the Court advised the parties of its intention to rule on the matter immediately, and to issue a written ruling by the next day. This decision is the somewhat tardy product promised by the Court.

### Analysis

■ This court entered its original order sealing proceedings pursuant to 11 U.S.C. § 107(b). That section provides that

On request of a party in interest, the bankruptcy court shall, and on the bankruptcy court's own motion, the bankruptcy court may—(1) protect an entity with respect to a trade secret or confidential research, development, or commercial information; or (2) protect a person with respect to scandalous or defamatory matter contained in a paper filed in a case under this title.

11 U.S.C. § 107(b). The statute's enforcing rule states that

On motion or on its own initiative, with or without notice, the court may make any order which justice requires (1) to protect the estate or any entity in respect of a trade secret or other confidential research, development, or commercial information, (2) to protect any entity against scandalous or defamatory matter contained in any paper filed in a case under the Code, or (3) to protect governmental matters that are made confidential by statute or regulation. If an order is entered under this rule without notice, any entity affected thereby may move to vacate or modify the order, and after a hearing on notice the court shall determine the motion.

FED.R.BANKR.P. 9018. Both the statute and the rule are similar to the provisions of Rule 26(c) which permits a court to "make any order which justice so requires to protect a party or person from annoyance, embarrassment, oppression, or undue burden or expense, including ... that a trade secret or other confidential research, development, or commercial information not be revealed or be revealed only in a designated way ..." FED.R.CIV.P. 26(c).

■ Courts are of course cognizant of the general rule that public access to court records and proceedings ought to be insured, in order to preserve public confidence in the integrity of the judicial process. *See, e.g., Securities & Exchange Comm. v. Van Waeyenberghe*, 990 F.2d 845, 848–49 (5th Cir.1993) (district court abused its discretion in placing a settlement agreement under seal). By the same token, section 107(b) (and, for that matter, Rule 26(c) of the Federal Rules of Civil Procedure) are congressionally sanctioned exceptions to this rule, and represent an entrustment of a certain amount of discretion to a trial judge to limit public access when, in the words of Rule 26(c), "justice so requires." *See, e.g., Martindell v. International Tel. & Tel. Corp.*, 594 F.2d 291, 295–96 (2d Cir.1979). In short, while the common law rule is well-entrenched, so also is the rule that the public right to access is far from absolute. *Nixon v. Warner Communications, Inc.*, 435 U.S. 589, 598, 98 S.Ct. 1306, 1312, 55 L.Ed.2d 570 (1978).[7]

---

7. Said the Court:

It is uncontested, however, that the right to inspect and copy judicial records is not absolute. Every court has supervisory power over its own records and files, and access has been denied where court files might have become a vehicle for improper purposes. For example, the common-law right of inspection has bowed before the power of a court to insure that its records are not "used to gratify private spite or promote public scandal" through the publication of "the painful and sometimes disgusting details of a divorce case." *In re Caswell*, 18 R.I. 835, 836, 29 A. 259 (1893). *Accord, e.g., C. v. C.*, 320 A.2d 717, 723, 727 (Del. Supr.1974). *See also King v. King*, 25 Wyo. 275, 168 P. 730 (1917). Similarly, courts have refused to permit their files to serve as reservoirs of libelous statements for press consumption, *Park v. Detroit Free Press Co.*, 72 Mich. 560, 568, 40 N.W. 731, 734–735 (1888); *see Cowley v. Pulsifer*, 137 Mass. 392, 395 (1884)

It is instructive to compare those situations in which a court ordered seal has been held to be appropriate and when it has been held not to be appropriate. In *Van Waeyenberghe*, for example, the court refused to counsel the sealing of a settlement agreement between one Howard Schwartz and the SEC, a sealing which Schwartz wanted as a condition to entering into a settlement, but to which the SEC refused to consent. According to the Fifth Circuit, the trial judge deemed the issue of sealing the record as a mere impediment to disposing of the case by agreement,[8] and so decided on his own to seal the record, over the SEC's objections. The Fifth Circuit scored the trial judge's failure to take into account the public's right to access to court records, and seemed especially moved by the fact that the consent decree permanently enjoined Schwartz from engaging in federal securities violations.[9]

In *Nixon v. Warner Communications, Inc.*, by contrast, the Supreme Court refused to set aside a court decision which refused permission to certain broadcasters to copy, broadcast, and sell to the public portions of the so-called Nixon tapes, on the grounds that since the convicted defendants had filed notices of appeal, their rights would be prejudiced if requests were granted, and that since the transcripts had apprised the public of the tapes' contents, the public's "right to know" did not overcome the need to safeguard the defendants' rights on appeal. *Nixon*, 435 U.S. at 594–95, 98 S.Ct. at 1310–11. The Court noted, *inter alia*, that the parties seeking access had alternative mechanisms available to them (in that case, a congressional enactment regarding the preservation of presidential papers and memorabilia). *Id.* at 605–06, 98 S.Ct. at 1316.

In two separate bankruptcy cases, bankruptcy judges refused newspapers access to certain court information, and refused to lift a court seal on those materials. In *In re Epic Associates*, Judge Bostetter sealed portions of the schedules, on grounds that disclosure of the identity of some of the institutional depositors holding the debtor's mortgage-backed certificates could well cause a run on the banks in the area. *In re Epic Associates*, 54 B.R. 445, 450 (Bankr.E.D.Va.1985). He refused to open that order in the face of a request by the Washington *Post*. *Id.* A newspaper also sought access to an examiner's report and background materials in the *Apex Oil* case, but Judge Schermer refused them, in part because there were certain privacy interests of third parties at stake.[10]

---

(per Holmes, J.); *Munzer v. Blaisdell*, 268 A.D. 9, 11, 48 N.Y.S.2d 355, 356 (1944); *see also Sanford v. Boston Herald–Traveler Corp.*, 318 Mass. 156, 158, 61 N.E.2d 5, 6 (1945), or as sources of business information that might harm a litigant's competitive standing, *see, e.g., Schmedding v. May*, 85 Mich. 1, 5–6, 48 N.W. 201, 202 (1891); *Flexmir, Inc. v. Herman*, 40 A.D.2d 799, 800 (N.J.Ch.1945). It is difficult to distill from the relatively few judicial decisions a comprehensive definition of what is referred to as the common-law right of access or to identify all the factors to be weighed in determining whether access is appropriate. The few cases that have recognized such a right do agree that the decision as to access is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case.
*Id.*

8. The district judge is quoted as saying, "[t]here is no reason in the world for the court to be devoting time to something where the only hang-up is a matter of principle." *Id.* at 847.

9. The Fifth Circuit was clearly not happy with what appears to have been a rather heavy-hand-

ed abuse of the sealing authority on the part of the district judge. The only differences that had kept the SEC from settling with Schwartz was the latter's insistence that the permanent injunction to which he had agreed as part of a consent decree be placed under seal, and the SEC's equal insistence that it *not* be sealed. The injunction was to prohibit Schwartz from committing any future federal securities violations and one can only imagine why Schwartz wanted such an injunction not to be available for public inspection. The trial judge, however, deemed the SEC's insistence on open records as a mere matter of principle, and, to pressure the SEC into settling, simply entered the injunction, but then sealed the *entire record of the case* on a *sua sponte* basis. The court then told the SEC that he would lift this seal only if the SEC moved to lift it *except* as to the injunction. Caught in a box of the district judge's creation, the SEC acceded, but then appealed. No one should be surprised that the Fifth Circuit thought that Judge McBryde had abused his discretion.

10. The newspaper wanted to review the very materials the court was reviewing in camera, a review by which the court was to decide which

*In re Apex Oil Co.*, 101 B.R. 92, 95 (Bankr. E.D.Mo.1989).

Perhaps the most revealing case reviewed by this Court in the context of the current dispute has been *Martindell v. International Telephone & Telegraph Corp.*, 594 F.2d 291 (2d Cir.1979). A district court, in a stockholders' derivative suit charging certain officers with waste of corporate assets by their expenditure of monies used to influence elections in Chile, had entered a protective order of confidentiality "providing that the fruits of the depositions, including transcripts of testimony and documents furnished by the defendants, were to be made available only to the parties and their counsel and not to be used for any purpose other than the preparation for and conduct of the litigation." *Id.*, at 293. Later the United States sought access to these depositions, as it was preparing indictments against some of these self-same directors for perjury relating to their testimony before a Senate Committee. The Department of Justice "speculated" that the depositions "might be relevant to its investigation" into similar matters and "might be useful in appraising the credibility, accuracy and completeness of testimony given by witnesses" and "might provide additional information of use to the Government." Perhaps most telling, "[t]he Government ... feared that unless it could obtain the deposition transcripts, it would be unable to secure statements from the witnesses because they would claim their Fifth Amendment rights in any investigative interviews by the Government." *Id.*[11]

Not surprisingly, the government argued that the district court had abused its discretion in refusing the government access to the transcripts. The government accused the district court of being motivated by a solicitude for the witnesses' Fifth Amendment rights, when the witnesses, "without being under any compulsion or coercion, chose to testify." *Id.* at 295. The Second Circuit found a significant counterbalance in the policy of protective orders to secure the just, speedy, and inexpensive determination of disputes by, *inter alia,* "encouraging full disclosure of all evidence that might conceivably be relevant." *Id.* Added the court:

> Unless a valid Rule 26(c) protective order is to be fully and fairly enforceable, witnesses relying upon such orders will be inhibited from giving essential testimony in civil litigation, thus undermining a procedural system that has been successfully developed over the years for disposition of civil differences. In short, witnesses might be expected frequently to refuse to testify pursuant to protective orders if their testimony were to be made available to the Government for criminal investigatory purposes in disregard of those orders.

*Id.* at 295–96. The court went on to rule that the deponents' reliance on the protective order was critical, such that the trial court's refusal to vacate or modify that order was not held to be an abuse of discretion. *Id.* at 297.

The court adverted to one additional consideration which it found to be compelling, to wit, the considerable alternative avenues already open to the government to obtain precisely the same information, albeit at a price of having to grant immunity in exchange for testimony. *Id.* at 296.

---

portions of the examiner's report would in fact be placed under seal and which would not, subject to request and/or objection on the part of the third parties and the debtors. Observed the court,

> No purpose would be served by sealing portions of the Report if prior to the sealing these portions are published [by the newspaper]. The Post–Dispatch shall not be permitted to peer over the Court's shoulder, as it considers what, if any, material to protect. To allow that would defeat the entire purpose of an in camera facility.

*In re Apex Oil Co.*, 101 B.R. 92, 96 (Bankr. E.D.Mo.1989).

11. To put the point on it, the government was quite certain that the deponents had *not* asserted their Fifth Amendment privilege in the depositions, so that, if it could but pry these depositions free of the protective order, they would have a clear *waiver* of the Fifth Amendment privilege in hand, and could then force the deponents onto the witness stand in a later criminal proceeding. The prospect of such a waiver must have seemed a most enticing bit of fruit, and no doubt strongly motivated the effort to break the protective order.

The *Martindell* case bears a remarkable similarity to the facts of this case. Here, as there, a party (actually, parties) wants to get behind a protective order, this time to take advantage of another kind of possible waiver—to wit, waiver of the attorney client privilege and of the work product exception. Both BPS and Jefferies spent a good deal of time arguing the merits of *Westinghouse Electric Corp. v. The Republic of the Philippines*, 951 F.2d 1414 (3d Cir.1991), a case addressing whether a party, by making voluntary disclosures to the SEC and the Department of Justice (albeit with the "promise" of confidentiality from each of these entities), has in the process waived those two privileges. It is unnecessary here to debate the merits of that decision. It is enough to note that the movants' reliance on that case demonstrates their intentions here. BPS has thus far been rebuffed in its efforts to overcome the assertion of privilege in the federal district court litigation. If they could but pry loose the seal from the record made at the retention hearing, however, then they might at least have another shot at the privileges, this time perhaps arguing that a waiver had taken place at that hearing, and relying on the *Westinghouse* case for support.[12]

Again, as in *Martindell*, it is not as though the movants do not already have a commanding arsenal of weapons at hand. The parties, according to the unrebutted statement of 50–Off's counsel, have already conducted *six days* of deposition testimony of various Akin, Gump attorneys. To the extent that their inquiry has not proceeded as far as they would prefer, that has only been because the attorney-client privilege and the work product doctrine have barred the way. And at least in the federal district litigation, the court has sustained the assertion of those privileges. The government in *Martindell* was advised that, if it faced a barrier in the

12. For what it is worth, the movants' confidence in the case as support for their waiver argument may be misplaced. The court there found especially significant the "voluntariness" of the disclosures made to the SEC especially. No court compelled their disclosures, and neither did any statute. Indeed, the program under which the disclosures were made was denominated as voluntary. *Id.*, at 1424. Our case more closely resembles the facts of *Martindell*, because the debtor, in order to retain counsel deemed essential to its prosecution of a cause of action owned by the estate, is constrained to make evidentiary disclosures about possible conflicts of interest. The evidentiary inquiry is one imposed by the statute (11 U.S.C. 327(e)), and in the usual case, is conducted by the court, with or without input from other interested parties. One might argue (as did BPS) that Akin, Gump and its client "volunteered" for this disclosure by the debtor's electing to continue its retention of Akin, Gump, but that argument drains the term of any real meaning. Suppose, in another situation, that the critical issue for the court evaluating the propriety of retaining counsel is not conflict of interest at all, but rather the advisability of the estate's incurring the expense of counsel to pursue litigation at all. The court, in pursuit of its independent administrative obligations, would be well within its rights to set the application for retention for hearing to consider that question, and would likely inquire into the merits of the proposed litigation in making its evaluation. This court has conducted such hearings on more than a few occasions. The trustee and its counsel would be understandably loathe to lay out their theory of the case, and the work product that goes into that evaluation, yet that is the price that must be paid for counsel to be retained. Any resulting disclosures could not legitimately be described as voluntary, for there is volition only in the sense that the trustee could always choose not to pursue what it otherwise believes to be valuable litigation, even though the trustee has an obligation to administer the estate's assets for the benefit of its creditors. William Satire would enjoy writing his *New York Times Magazine* column some Sunday hooting at such a prostitution of a simple word that hardly carries any such meaning in the real world that most of the rest of the planet (other than lawyers) inhabits.

It is also worth noting here the difference between conflicts of interest in the bankruptcy context and in the nonbankruptcy litigation context. Outside of bankruptcy, upon learning of a potential conflict, the client may waive the conflict and retain counsel voluntarily. The alignment of interests in the bankruptcy context may (and usually will) prevent the debtor from freely exercising such a waiver of conflicts, to the extent that retention of counsel affects the bankruptcy estate and, *ergo*, affects the pecuniary interests of the *creditors*. In the instant case, the costs associated with retaining separate special counsel for pursuit of 50–Off's state and federal claims might well have placed an unwarranted drain on the estate's assets, to the detriment of creditors. Nevertheless, in spite of these economic considerations, the Bankruptcy Code itself imposes countervailing considerations, ultimately for the benefit of creditors. In balancing these considerations, the court may be called upon to fashion an alternative remedy to ameliorate the potential conflict. In all events, however, the calculus is different from that employed by a court in ordinary, nonbankruptcy litigation.

Fifth Amendment, that was hardly a barrier that had been erected by the district court's protective order. Similarly, this court's order sealing the record does not bar the movants from seeking anything they may legitimately obtain via discovery. If they face a barrier in their efforts in the form of attorney-client privilege or work product, that is hardly a barrier of this court's making.

■ Section 107(b) is a codified exception to the general rule (set out in § 107(a)) that the records of proceedings in bankruptcy are to be public. While the exception ought, as the cases indicate, be sparingly applied, the very existence of the exception demonstrates Congress' anticipation that the administration of bankruptcy cases might, by their very nature, require special intervention to protect some kinds of information from dissemination to the world. Perhaps more than any other type of proceeding, bankruptcy is, in the main, conducted under the harsh glare of public scrutiny, exposing to public view (at least potentially) a wide scope of information which, in a nonbankruptcy context, would normally be thought to enjoy a certain expectation of privacy. A debtor, for example, must prepare an exhaustive listing of all of its assets and all of its liabilities, and file that list in the public records, available for inspection by literally anyone. FED.BANKR.R.P. 1007. If the debtor did not file bankruptcy, that information would almost never be available on demand to the public at large (and certainly not under penalty of perjury). Credit reporting agencies, for example, are extremely limited in the extent to which they can release even the relatively summary information they have at their disposal regarding a given debtor's liabilities.

A debtor's lawyer outside of bankruptcy would not normally be required to submit its bills to public scrutiny as a condition to payment either, nor would the circumstances of retention ever be a matter of public inquiry. Bankruptcy changes the rules, however, in part because the debtor's creditors become its new "equity interest holders," as it were, and so are entitled to have access to matters otherwise closed to them outside of bankruptcy (including the details and circumstances surrounding retention of profession-als). To be sure, the public is deemed to have a "right to know" about the affairs of an entity that has chosen bankruptcy protection. Yet it is precisely this extraordinary exposure that compels the occasional protective intervention of the court. The retention of professionals may, in some circumstances, represent one circumstance in which such intervention is essential in order to preserve the value of an estate's assets, in this case, an asset consisting of a cause of action deemed to be valuable to the estate. *See* 11 U.S.C. § 541(a) (estate includes all assets in which debtor has any legal or equitable interest).

Outside of bankruptcy, if a company such as 50–Off wished to pursue litigation against a third party (such as BPS and Jefferies), it would be permitted to select its own attorneys, to confer with those attorneys regarding the potential value of the litigation, to discuss the litigation strategy that ought to be employed, and to settle on payment arrangements that ought to be made—all without fear of public scrutiny, and certainly without fear of invasion of those conversations by the very defendants who are to be sued. No defendant would ever presume, as its first line of discovery, to simply depose the attorneys for the plaintiff, and to then ask them in detail about what was said and done at its initial conference with the plaintiff (even though such a deposition would no doubt reveal relevant evidence or be calculated to lead to the discovery of relevant admissible evidence). Were such an extraordinary course actually pursued by an attorney with the temerity to try it, a Rule 26(f) protective order would no doubt issue almost immediately, and shroud such conversations from view behind the cloak of attorney-client privilege and attorney work product.

Yet, once bankruptcy is filed, the self-same debtor may be compelled to conduct at least a portion of this "conference" in open court. This is because bankruptcy transfers the cause of action from the pre-petition debtor to the post-petition estate, and the estate's creditors have a vested interest in the administration of its assets (including lawsuits). The bankruptcy judge is in turn placed into the center of the retention process by statute, and has an obligation to make appropri-

ate inquiry in order to make the determination necessary under section 327(e) before the estate is permitted to hire a lawyer to pursue the lawsuit. *See* 11 U.S.C. § 327(e); *In re Drexel Burnham Lambert Group, Inc.,* 112 B.R. 584, 586 (Bankr.S.D.N.Y.1990).[13] Because monies are to be extended by the estate on a post-petition basis out of the ordinary course of business, the court also has some obligation to determine whether it is in the best interests of the estate to even incur the expense necessary to pursue the "liquidation" of this particular "asset." *See* 11 U.S.C. § 364(a) (estate may incur post-petition debt without court approval only for "ordinary course of business" expenditures); *see also In re Allied Computer Repair, Inc.,* 202 B.R. 877, 880–81 (Bankr.W.D.Ky.1996) (bankruptcy court plays a significant role in protecting the assets of the bankruptcy estate in order that they be maximized for the benefit of the creditors thereof, and has responsibility for seeing that estate assets are not wasted and that attorneys do not overreach in an attempt to be paid fees from the estate); *accord In re Copeland,* 154 B.R. 693, 697 (Bankr.W.D.Mich.1993); *see also Matter of Taxman Clothing Co.,* 49 F.3d 310, 315 (7th Cir.1995) ("neither the trustee in bankruptcy nor the trustee's lawyer has a duty to collect an asset of the debtor's estate if the cost of collection would exceed the value of the asset. His duty is to endeavor to maximize the value of the estate, which is to say the net assets. The performance of this duty will sometimes require him to forbear attempting to collect a particular asset, because the costs of collection would exceed the asset's value").

The court's inquiry in the course of such a hearing may well need to be far-ranging, and include probing questions that would, in ordinary non-bankruptcy litigation, be thought to invade the attorney-client privilege or require explication of the attorney's work product. Without such information, the court might find itself literally unable to do its job. That is the unique nature of bankruptcy. Must the estate and its counsel then be put to a Hobson's choice in every bankruptcy case in which counsel is to be retained to pursue litigation? To forego pursuit of a valuable asset (because the court refuses to grant authority to retain counsel without evidence that such retention is appropriate) or alternatively to disclose privileged communications and work product (in order to put on the evidentiary predicate necessary for the court to authorize retention)? The choice is made that much more difficult by the fact that, absent special protection on the part of the court, the record of such a hearing is public, available for transcription by anyone, *including the target defendants!* In other words, a defendant being sued by a bankruptcy estate (absent special protections by the court) could conceivably obtain privileged information (by the simple expedient of ordering up a transcript of the retention hearing in the bankruptcy case) that it would never be permitted to obtain by way of discovery in the non-bankruptcy litigation.

■■■ Section 107(b), by its express terms, affords a bankruptcy judge some authority to prevent just such an obvious injustice by permitting the court to protect an entity "with respect to ... confidential research ... or commercial information." 11 U.S.C. § 107(b)(1). Certainly, a lawyer's work product is one type of "confidential research" that falls within the plain language of the statute's protection. And certainly a client's disclosures made in confidence to its attorneys is one kind of "confidential ... commercial information."[14] The statute, on

---

13. Said Judge Bushman,

> Under both sections [327(a) and 327(e) ], judicial approval is expressly required. 2 K. KLEE, R. LEVIN, J. LEWITTES, H. MILLER, P. MURPHY, J. SAMET AND W. STERN, COLLIER ON BANKRUPTCY ¶ 327.02 (15th ed.1989). The duty of the Court to review the application is independent of the absence of any objection and stems from its duty of independent review of applications for compensation. *See In re Stable Mews,* 49 B.R. 395, 398 (Bankr.S.D.N.Y.), *aff'd in an unreport-*

*ed opinion* (S.D.N.Y.), *appeal dismissed,* 778 F.2d 121 (2d Cir.1985).

*Drexel Burnham Lambert,* 112 B.R. at 586.

14. The court has been unable to find any cases specifically applying section 107(b)(1) to attorney-client privilege or attorney work product. This is not so surprising as it might first seem, however, because the court that seals the record is unlikely to then *publish* a decision regarding why it has sealed the record, threatening the very confidentiality thought to have been conferred.

its face, states that the bankruptcy court is *required* to protect such an entity on request of a party in interest, and such a request was made in this case, at the outset, *before* any statements were made. In short, the debtor, recognizing the difficult choice with which it would otherwise be presented absent court protection, immediately sought that protection, so that the court could discharge its obligations without, in the process, causing substantial injury to the very asset (*i.e.,* the lawsuit) that the debtor was trying to pursue. Work product and client disclosures could then be made (if necessary) in the course of the court's evaluation of how this litigation ought to be managed and pursued.

■ Statements made under the protection of a court order issued pursuant to section 107(b), and at the request of the party seeking that protection for the purpose of insulating either attorney-client privilege or work product disclosures do not result in a waiver of the privilege. To the contrary, the intention to seek shelter beforehand, in recognition of the danger of waiver, demonstrates nonwaiver. The reasoning is simple. The sealing order itself functions to prevent disclosure, except as is necessary for the bankruptcy court to perform its administrative, statutorily imposed duties, and for the "members of the family" (*i.e.,* the creditors of the estate who have, by virtue of the bankruptcy filing, become *de facto* "equity interest holders" in the estate, with a vested interest in the management and disposition of that estate's assets) to have adequate input into the court's decisionmaking process. Section 107(b), in this particular context, functions as a sort of "substitute" for the privileges in question, to permit the court to make the necessary inquiries without exacting, as a price, a waiver of the very privileges that help to preserve the value of the estate asset (*i.e.,* the lawsuit in question).

Moreover, in ten years on the bench, this court has had occasion to seal a retention hearing record on only a handful of occasions and has *never* had a party litigant later seek to lift the seal in order to obtain what would usually be presumed to be protected by either work product or attorney-client privilege. However, a district court observed, with respect to the work product

■ Compelled disclosure, which is, in essence, what occurs when the bankruptcy court sets a hearing to consider the advisability of hiring a particular law firm in order to pursue a specific piece of litigation (and the advisability of spending money in that pursuit), does not, in this court's view, constitute a waiver in any event:

In determining whether the privilege should be deemed to be waived, the circumstances surrounding the disclosure are to be considered. *United States v. Zolin,* 809 F.2d 1411, 1415 (9th Cir.1987), *aff'd in part and vacated in part, 491* U.S. 554, 491 U.S. 554, 109 S.Ct. 2619, 105 L.Ed.2d 469 (1989). When the disclosure is involuntary, we will find the privilege preserved if the privilege holder has made efforts 'reasonably designed' to protect and preserve the privilege. *See Transamerica Computer, 573* F.2d at 650. Conversely, we will deem the privilege to be waived if the privilege holder fails to pursue all reasonable means of preserving the confidentiality of the privileged matter. In our view, an analysis which permits the court to consider the circumstances surrounding a disclosure on a case-by-case basis is preferable to a per se rule of waiver. This analysis serves the purpose of the attorney client privilege, the protection of communications which the client fully intended would remain confidential, yet at the same time will not relieve those claiming the privilege of the consequences of their carelessness if the circumstances surrounding the disclosure do not clearly demonstrate that continued protection is warranted.

*United States v. de la Jara,* 973 F.2d 746, 749 (9th Cir.1992). It has been observed that

[w]here disclosure was judicially compelled the argument that the holder of the privilege should, in order to preserve the privilege, be required to stand firm and take the consequences, including a judgment for

doctrine that "this doctrine 'establishes a zone of privacy for strategic litigation planning and prevents one party from piggybacking on the adversary's preparations" and may even extend to materials prepared by agents on the attorneys' behalf. *Garrett v. Metropolitan Life Insurance Co.,* 1996 WL 325725 (S.D.N.Y.1996).

contempt, is rejected as exacting of the holder greater fortitude in the face of authority than ordinary individuals are likely to possess, and assuming unrealistically that a judicial remedy is always available. MICHAEL H. GRAHAM, HANDBOOK OF FEDERAL EVIDENCE, FOURTH EDITION, Article V, *Privileges*, Standard 512, Advisory Note at note I (West 1996). Section 327(e) itself makes the retention decision contingent on court approval, and necessarily implicates judicial review. It has been held that a bankruptcy court may (perhaps is even obligated to) perform that review even in the absence of objections by any party in interest. *In re Drexel Burnham Lambert Group, Inc.*, 112 B.R. 584, 586 (Bankr.S.D.N.Y.1990).[15] Under the circumstances, then, any disclosures made in the course of a retention hearing, in response to searching inquiry from a court which, without such disclosures must summarily refuse the retention request, can only be practically described as "compelled." When a party, anticipating just such an inquiry, requests protection at the outset, that party has done all it can under the circumstances to protect both its attorney-client privilege and its attorneys' work product. That is what the debtor did in this case, and it seems impossible to imagine that the law would impose any further duty—or that it would impose a sanction for complying with a statutory obligation.[16]

The court thus concludes that it was justified in placing the retention hearing under seal, in order to protect confidential research and confidential commercial information. Indeed, such protection was absolutely essential in order for the court to then proceed to the statutory task of evaluating whether this litigation should be pursued, at what cost, and by what law firm. A full and candid discussion of all relevant factors was essential to an informed decision, but that selfsame candor, placed onto a public record (and so available to the defendants in the litigation), could have threatened the very ability of the estate to pursue the litigation to any effect. Section 107(b)(*l*) was here employed precisely to achieve the purpose for which this court is confident Congress enacted the statute, namely, to accomplish effective bankruptcy administration.

It remains, then, to consider whether the seal ought here to be released. The cases addressing modification of an order sealing the record hold that, "[o]nce a confidentiality order has been entered and relied upon, it can only be modified if an 'extraordinary circumstance' or 'compelling need' warrants the requested modification." *In re Apex Oil Co.*, 101 B.R. 92, 103 (Bankr.E.D.Mo.1989); *Federal Deposit Insurance Corporation v. Ernst & Ernst*, 677 F.2d 230, 232 (2nd Cir. 1982).[17] The debtor and its counsel both

---

**15.** The duty is similarly imposed on the bankruptcy court with respect to the actual applications for payment submitted by counsel:
 ... [T]he task of reviewing fee applications falls by default onto the bankruptcy courts. We are keenly aware that many bankruptcy courts have bemoaned their duty to review fee applications as a thankless, onerous burden, one which consumes a significant share of a bankruptcy judge's time, *see* Gordon Bermant, Patricia A. Lombard & Elizabeth C. Wiggins, *A Day in the Life: The Federal Judicial Center's 1988–89 Bankruptcy Court Time Study*, 65 AM. BANKR. L.J. 491,513–14(1991). But in holding that bankruptcy courts have an independent duty to review fee applications even absent objections, we find support in legions of cases decided by bankruptcy and district courts spanning nearly two-thirds of all federal districts as well as in the writings of several renowned commentators. We find additional support in the legislative history to the 1978 amendments to the Code and in a number of court of appeals' decisions (including one from this Court) cogently resolving related points.

*In re Busy Beaver Building Centers, Inc.*, 19 F.3d 833, 843–44 (3d Cir.1994) (footnotes omitted, but citing dozens of cases for support).

**16.** The court, of course, had the ability to re-evaluate its decision to seal the record if, at the conclusion of the hearing, it concluded that, in fact, there was nothing actually requiring protection within the meaning of section 107. The court in fact did consider just that at the conclusion of the hearing, and decided that the seal ought to remain in place.

**17.** The movants allege that, because they were never properly noticed of the original request, the burden lies with the debtor to demonstrate the justification for the order sealing the record remaining in place. Although the Court agrees with movants regarding the factual question whether they received proper notice such that they could have interposed an objection at the time the seal was first placed on the record (they did not), the movants still have the burden of demonstrating why the seal should be removed.

relied on this court's order sealing the record at the retention hearing in making disclosures to the court relating to retention, disclosures involving the debtor's evaluation of the advisability of even pursuing the litigation at all and of any facts relating to the "disinterestedness" standard in section 327(e) relative to the retention of Akin, Gump to pursue that litigation.

Neither BPS nor Jefferies has demonstrated any extraordinary circumstances or compelling need that would warrant modifying the existing order sealing that record. They advert to the "possibility" of discovering "relevant information" but that is the same standard that applies to all of their current discovery efforts. Certainly competent counsel represents both movants, and presumably they have fully exploited the discovery remedies available to them. No doubt they have fully explored with every possible witness they could find the very matters which

proved to be the subject of the retention hearing, and the confidentiality order certainly posed no great bar to that effort. Movants suggest that, by exploring the retention hearing record, they might discover some inconsistent statement that would be useful at trial, but no rule of law mandates that a party has the right to ferret out every possible inconsistency that might ever have been uttered, even if that means delving into areas shut off to them by a protective order. A careful balancing of interests confirms that, while the right to discovery is critically important, it is something less than sacrosanct.[18]

BPS and Jefferies have argued that there may be a certain letter that was offered into evidence at the retention hearing, a letter which they have thus far been unable to obtain. This is but a stalking horse. Debtors have maintained both in discovery and at

Beyond the general observation that all proceedings ought, as a general rule, be open, movants have offered little more, instead awaiting the debtors presentation of reasons why the record ought to remain closed. The debtors, in response, have simply stated that the purpose of the hearing was to consider retention, and that the purpose of the seal was to enable the candor required for the Court to make its decision on the issue of retention.

The difficulty here is really illusory. The Court has not laid out on the record (other than under seal) the reasons that it granted the motion to seal. This the Court should have done. See In re Epic Associates V, 54 B.R. 445, 450 (Bankr. E.D.Va.1985); SEC v. Van Waeyenberghe, 990 F.2d 845, 849 (5th Cir.1993). The Court rectifies that problem here by expressly noting that it deemed a sealing of the record essential in order to assure that it received a full and candid explication of the circumstances surrounding retention, including questions regarding the value of the litigation to the estate, the strength of the assertions then being made by BPS and Jefferies (assertions voiced to the United States Trustee with the evident hope that that officer would then raise those concerns to the court) regarding the possibility that Akin, Gump might either end up being a party to the litigation or, alternatively, find itself the target of litigation from its own client, and the cost of pursuing such litigation. The Court also took into account the possibility that, during the course of such a hearing, it might be necessary for the debtor's counsel to divulge certain information regarding its evaluation of the lawsuit that might conceivably be deemed attorney work product and that only a protective order sealing the record would pre-

vent either the invasion of that product (such as, for example, by means of the other side's ordering a transcript of the retention hearing) or the arguable waiver of the privilege. As it has turned out, so long as the litigation against BPS and Jefferies remains pending, the concerns that motivated the Court to enter the seal in the first place appear to remain vital.

With that predicate, it was incumbent on BPS and Jefferies to make the requisite showing of "extraordinary circumstance" or "compelling need" referenced in the case law. The Court has reviewed the *Robert Landau* decision, upon which Movants rely for their "burden-shifting" argument, and find it not to be persuasive. The court there was not confronted with a motion to modify under Bankruptcy Rule 9018, as here, but a motion to set aside the *original order*, under Rule 6(b). See In re Robert Landau Assoc., Inc., 50 B.R. 670, 670–71 (Bankr.S.D.N.Y.1985). In other words, the court there was asked to re-examine the original grounds of the motion to determine whether that order should be withdrawn, revoked or set aside. Concluding that the court had been furnished with considerably less than the whole story to begin with, and noting that the order was not entered to aid estate administration at all, but to aid the U.S. Attorney in its pursuit of a separate criminal investigation, Judge Brozman set the order aside. *Id.* The case hardly supports the proposition for which it is urged by Movants in this proceeding with regard to burdens of proof. Nor, for that matter, does it render much assistance with regard to the remaining issues in this case.

**18.** The very existence of Rule 26(c) confirms this simple truism.

the hearing on these motions that they do not have the letter, and neither does their counsel. All parties concede that a draft was prepared at some point in time. The ordinary rules of discovery afford the movants plentiful devices with which to compel the discovery of this mysterious letter, and serious remedies in the event the letter is being withheld. Assuming the letter was ever tendered at the retention hearing,[19] the movants already have (and have, apparently, already exercised) numerous devices with which to obtain the document in question.

BPS and Jefferies also argue that information which came out at the retention hearing might be relevant to the inquiry after the reasonableness of the fees requested by Akin, Gump in the litigation. That too, however, is a stalking horse. First of all, little of value with regard to the reasonableness of fees is likely to come out at a retention hearing. At most, the Court might explore the *likely* cost of litigation. Anyone who has ever been involved in complex state or federal litigation with well-represented defendants well knows how little confidence anyone (including the Court) can repose in such an estimate, as the actual cost of litigation is often a function of the creativity, aggressiveness, and intelligence of opposing counsel. Second of all, as already noted, both Movants already have at hand access to billing statements, redacted for privilege and work product. No such billing statements would have been available at the retention hearing, but are certainly available in redacted form through the ordinary discovery process. Movants are entitled to no more.

In short, Movants have failed to put forward the compelling interest or extraordinary circumstances that would warrant opening the seal on the retention hearing. More to the point, however, the record in this matter seems at least to suggest an "improper purpose" as that term was used by the Supreme Court in the *Nixon* case. *See Nix-*

*on v. Warner Communications, Inc., supra.* BPS, in its arguments, added "What've they got to hide?" The answer, quite simply, is whatever the attorney-client privilege and the work product doctrines entitle them to hide. It appears that what the Movants in reality seek here is a circumvention of those privileges, an effort to prove up a waiver by virtue of statements that might have been made in the retention hearing. Certainly, both BPS and Jefferies strenuously argued that they believed that just such a waiver had taken place. For the reasons stated in this decision, the Court does not agree that any such waiver occurred. More to the point, it is precisely such an argument that furnishes one ground for courts to seal the record in such retention hearings. The statute and its implementing rules require disclosures of a sort that would make any adversary's mouth water. Due administration of a bankruptcy estate requires that a court be able to inquire into these important issues without, in the process, jeopardizing the value of the very litigation sought to be pursued.[20] The sealing device permits the court to do its job fully, permitting both a full inquiry and assuring the protection of the asset that the cause of action represents. The Movants here want to "break the seal" for precisely the reasons that the Court imposed it in the first place—to acquire information to which they would otherwise not be entitled in ordinary nonbankruptcy litigation. The Supreme Court in *Nixon* noted that the discretion to bar access to judicial records "is one best left to the sound discretion of the trial court, a discretion to be exercised in light of the relevant facts and circumstances of the particular case." *Nixon*, 435 U.S., at 598, 98 S.Ct. at 1312–13. It recognized that what constitutes an "improper purpose" would have to be left to development of the case law, as unique factual scenarios arose. Under the facts of this particular case, this Court believes that a litigant's seeking to

19. In the "for what it's worth" category, the court has reviewed the exhibits tendered at the retention hearing, and has found no such letter.

20. The Court, in its research, was unable to find any published bankruptcy decision regarding the sealing of a retention hearing, even though the Court in its conversations with its colleagues

over the last ten years well knows that the practice is a common one. The lack of a published opinion on the topic is no doubt attributable to the belief that the court, in the process of explaining itself, might also undermine the very protections intended to be given.

obtain information from a retention hearing involving the litigant's opposing counsel is an "improper purpose" within the meaning of that term as used in *Nixon,* so that access should be denied.

If the rule that BPS and Jefferies espouse were adopted, then no estate could *ever* hire counsel in a bankruptcy case without being forced to jeopardize the value of its causes of action. For Movants would maintain that (a) the record of such hearings should always be open and (b) any statements made regarding the attorney's evaluation of the case would operate as a waiver of the work product privilege and perhaps of the attorney-client privilege as well. Every estate would be whipsawed. Seek retention, and hope that no one (including the court) asks any questions. If anyone asks any questions, then withdraw the request and leave the litigation unpursued. This Court seriously doubts that that is, or ever ought to be, the rule in bankruptcy cases. Indeed, section 107(b) seems to have been promulgated at least in part to prevent such an untoward result. I decline to adopt such a rule in this case.

The motions to modify the order sealing the record are denied.

**SO ORDERED.**